Theodore H. Frank (SBN 196332)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org

*Attorneys for Plaintiffs Michael Couris and Michael Fitzgibbons*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL COURIS and MICHAEL FITZGIBBONS,<br><br>  Plaintiffs,<br><br>  v.<br><br>KRISTINA D. LAWSON, in her official capacity as President of the Medical Board of California; WILLIAM J. PRASIFKA, in his official capacity as Executive Director of the Medical Board of California; and ROBERT BONTA, in his official capacity as Attorney General of California,<br><br>  Defendants. | '22CV1922 MMA JLB<br>Case No.: 22-cv-_____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983 AND UNDER CALIFORNIA LAW** |

**Introduction**

On September 30, 2022, Governor Newsom signed AB-2098 ("Statute"), which adds Section 2270 to the California Business and Professions Code. The Statute declares it "unprofessional conduct for a physician or a surgeon to disseminate misinformation or disinformation related to Covid-19." The Statute intrudes on the patient-doctor relationship and violates the First Amendment's protections of free speech because it regulates the content of patient-doctor communications and interferes with the candid conversations and exchanges between physicians and patients that are critical to the patient-doctor relationship.

Plaintiffs Michael Couris and Michael Fitzgibbons are physicians licensed in the State of California and will be subject to the constraints of the statute. Doctors Couris and Fitzgibbons share a legitimate concern that, because they may hold opinions and beliefs about COVID-19, masking and social distancing, the vaccines, or potential treatments for COVID-19 that now or at one time were perhaps not held by most of the public or most of physicians, **and** because they shared and either intend to continue or would like to continue to share those opinions and beliefs when advising and consulting patients, they may be subject to investigation and discipline by the Medical Board of California pursuant to AB 2098.

Doctors Couris and Fitzgibbons thus bring this civil rights action against Defendants to vindicate their rights under the First and Fourteenth Amendments of the United States Constitution and Article I of the California Constitution, upon which AB 2098 infringes both on its face and as applied. Plaintiffs seek to enjoin Defendants in their official capacity from enforcing the Statute.

**Parties**

1. Plaintiff Doctor Michael Couris is a resident of San Diego County, California; and a United States and California citizen. He is a physician licensed by the Medical Board of California to practice medicine in the State of California.

2. Plaintiff Doctor Michael Fitzgibbons is a resident of Orange County, California; and a United States and California citizen. He is a physician licensed by the Medical Board of California to practice medicine in the State of California.

3. Defendant Kristina D. Lawson is the President of the Medical Board of California ("Board"), the state licensing authority that regulates the practice of medicine in the state, and she is a defendant in this case in her official capacity. The mailing address for the Board is 2005 Evergreen Street, Suite 1200, Sacramento, California 95815.

4. Defendant William J. Prasifka is the executive director of the Board, and he is a defendant in this case in his official capacity. Upon information and belief, Defendant Prasifka is responsible for the Board's decision to investigate physicians for violating Board-enforced laws and rules or supervises subordinate Board employees who make such decisions. The mailing address for the Board is 2005 Evergreen Street, Suite 1200, Sacramento, California 95815.

5. Defendant Attorney General Robert Bonta is sued in his official capacity as the chief law officer for the State of California. His address for service of process is 1300 "I" Street, Sacramento, California 95814.

**Jurisdiction and Venue**

6. Plaintiffs bring this action under Section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, for violating the First and Fourteenth Amendments to the United States Constitution; and under California law for violating Article I, Section 2 of the California Constitution. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a), and supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367.

7. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiffs' claims occurred in this district.

**Facts**

8. The Medical Board of California ("Board") is the state agency charged with investigating physicians and surgeons for unprofessional conduct and had that authority before the passage of AB 2098. *See* Cal. Bus. & Prof. Code §§ 2220, 2234.

9. The Board has the authority to commence disciplinary actions against licensee physicians and surgeons for unprofessional conduct. *See* Cal. Bus. & Prof. Code § 2220.5. Discipline can include suspension or revocation of the license to practice medicine. *See* Cal. Bus. & Prof. Code § 2227. Defendants Lawson and Prasifka are Board members and have disciplinary authority.

10. The Federation of State Medical Boards ("FSMB") represents state medical and osteopathic regulatory boards and supports the member boards. *See About FSMB*, Federation of State Medical Boards, https://www.fsmb.org/about-fsmb.

1    11.    Upon information and belief, Defendant Lawson is a voting member of the FSMB or a fellow, and currently serves on the FSMB's Ethics and Professionalism committee.

12.    On July 29, 2021, the FSMB issued a press release stating:

> Physicians who generate and spread COVID-19 vaccine misinformation or disinformation are risking disciplinary action by state medical boards, including the suspension or revocation of their medical license. Due to the specialized knowledge and training, licensed physicians possess a high degree of public trust and therefore have a powerful platform in society, whether they recognize it or not. They also have an ethical and professional responsibility to practice medicine in the best interest of their patients and must share information that is factual, scientifically grounded and consensus-driven for the betterment of public health. Spreading inaccurate COVID-19 vaccine information contradicts that responsibility, threatens to further erode public trust in the medical profession and thus puts all patients at risk.

*FSMB: Spreading Covid-19 Vaccine Misinformation May Put Medical License at Risk,* Federation of State Medical Boards, News Releases (Jul. 29, 2021); https://www.fsmb.org/advocacy/news-releases/fsmb-spreading-covid-19-vaccine-misinformation-may-put-medical-license-at-risk/.

13.    Meeting minutes from the Board's February 2022 Board meeting show that Defendant Lawson echoed the FSMB's press release. The meeting minutes state:

> Ms. Lawson stated it is the duty of the board to protect the public from misinformation and disinformation by physicians, noting the increase in the dissemination of healthcare related misinformation and disinformation on social media platforms, in the media, and online, putting patient lives at risk in causing unnecessary strain on the healthcare system.
>
> Ms. Lawson elaborated [that] in July 2021, the Federation of State Medical Boards released a statement saying physicians spreading

    misinformation or disinformation risk disciplinary action by their state medical board.

Medical Board of California, Meeting Minutes for Feb. 10-11, 2022 at 6, https://www.mbc.ca.gov/About/Meetings/Minutes/31009/brd-Minutes-20220210.pdf.

 14. Around the same time, the California Assembly introduced AB 2098, a bill that targeted the dissemination of "misinformation or disinformation related to Covid-19" by physicians and surgeons. The bill specifically referenced the FSMB's July 2021 press release to justify the legislation. *See AB-2098 Physicians and Surgeons: Unprofessional Conduct (2021-2022)*, Cal. Legislative Information (Bill Text, June 21, 2022), https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB2098#99INT, Section 1(f).

 15. In April, the Assembly amended the original version of AB-2098 because of concerns that it might penalize physicians for public speech. Accordingly, the Assembly amended the bill to limit its application to "treatment or advice" to a patient. *See AB-2098 Physicians and Surgeons: Unprofessional Conduct (2021-2022),* Cal. Legislative Information (Bill Analysis, April 15, 2022), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB2098, Page 12, paragraph 3.

 16. The Board, at its May 2022 meeting, expressed reservations about AB 2098. Some Board members noted that the Board already had authority to investigate and discipline physicians for conduct that misled or was harmful to patients. *See* Medical Board of California Quarterly Board Meeting May 19-20, 2022 (Day 2), https://www.mbc.ca.gov/About/Meetings/Minutes/31033/brd-Minutes-

1  20220519.pdf, (link to video of meeting https://www.youtube.com/watch?v=dz-3h2IEcb4&t=7726s (2:08:48 to 3:03:00)) (May 26, 2022).

17. The meeting minutes also reflect the Board's concern that "the definitions of misinformation/disinformation may prove challenging for the Board to prove." *See* Medical Board of California, Meeting Minutes for May 19-20, 2022 at 8, https://www.mbc.ca.gov/About/Meetings/Minutes/31033/brd-Minutes-20220519.pdf.

18. On August 30, 2022, the California Assembly approved the final amended version of AB 2098 which the State Senate had approved the previous day. Governor Newsom signed AB 2098 into law on September 30, 2022.

19. Section 1 repeats the FSMB warning from its July 2021 press release stating that physicians who disseminate COVID-19 vaccine misinformation or disinformation jeopardize their medical licenses.

20. Section 2 of the Statute adds Section 2270 to the California Business and Professions Code and makes it "unprofessional conduct" for any California physician or surgeon "to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines."

21. Section 2 defines disinformation as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead."

22. Section 2 defines misinformation as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."

23. Section 2 defines disseminate as "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice."

24. The Statute impermissibly intrudes on the patient-doctor relationship and limits the ability of the doctor and the patient to have a free, open, and candid conversation about COVID-19, its treatments, and the vaccines.

25. The Statute purports to codify an official "scientific consensus" that is not the role or responsibility of the government and departs from fundamental scientific and medical inquiry, which requires that conventional views, especially those concerning new diseases, ailments, conditions, and related treatments, be challenged by opposing, contrary, dissenting, skeptical, or critical voices or opinions.

26. The notion that there is "scientific consensus" regarding COVID-19 is flawed. During the pandemic, public health officials, medical researchers, and individuals within the medical community have revised guidance, issued contradictory or conflicting statements, or altered previously held positions on matters ranging from the origins of the virus, transmission of the virus, lockdowns, school closures, mask-wearing, the effectiveness of the vaccines to prevent infection and reduce transmission, and the need for boosters.

27. For example, National Institute of Allergy and Infectious Diseases Director Dr. Anthony Fauci, perhaps the most high-profile public health official since the pandemic began and the architect of the federal government's response to the pandemic, has a well-documented history of inconsistent statements, mixed messages or reversals regarding a variety of COVD-19 issues.

28. The Statute contradicts the responsible practice of medicine, which requires that doctors tailor medical care and advice to a particular patient using their best professional judgment.

29. The Statute also fails to recognize that standards of care are not stable. What might be considered experimental or untested might in six months or a year become accepted practice or the preferred treatment, especially for a novel disease where medical facts are uncertain.

30. Critically, neither the Board nor licensees will be able to say with any certainty or consistency what is fair or foul under the Statute because of its vague and broad definitions. For instance, if a doctor, echoing the sentiments of then-U.S. Senator from California and now Vice President Kamala Harris, expresses reservations to a patient about taking a COVID-19 vaccine fast-tracked for FDA approval developed under the prior administration, would that constitute misinformation or disinformation? What about a doctor advising patients that the vaccine he or she believes has the least risk is the more traditional vaccine developed by Novavax, rather than the mRNA vaccines developed by Pfizer or Moderna; would such counsel be deemed misinformation or disinformation? Or consider a scenario in which a patient asks a doctor about treatments and mentions ivermectin. If the doctor responds that ivermectin may have some promise as a treatment and the National Institutes of Health is open to studying whether it really is a viable treatment, could such a comment trigger an investigation by the Board under newly enacted Section 2270? Similarly, if a patient tells the doctor that they have already had COVID-19 and asks whether to get the vaccine or a booster and the doctor responds that the prior

infection perhaps provides better protection than the vaccine, and that the marginal benefit of an additional vaccination does not outweigh the risk of vaccine side effects, will that result in investigation by the Board?

31. Even if an investigated doctor is ultimately vindicated, the process is the punishment, and highlights the chilling nature of the statue. Moreover, an unconstitutional speech restriction is not salvageable because enforcement authorities say that it will be enforced only in a narrow or benign manner. *E.g., United States v. Wunsch*, 84 F.3d 1110, 1118 (9th Cir. 1996). As a result, doctors are likely to self-censor, potentially to the detriment of patients.

32. AB 2098 also infringes on the First Amendment rights of patients to hear the advice and counsel from the doctors they consult. The patients are entitled to unfiltered consultations with their doctors, rather than a potentially narrow self-censored message that hues closely to a preferred government narrative regarding COVID-19.

33. Doctors were and remain at risk of investigation and discipline if they provide negligent or substandard medical care. The Board has the authority to monitor, investigate, and regulate the conduct of doctors' treatment of patients. The Statute exceeds these standards and heightens the risk to physicians of investigation and unfounded discipline with vague terms such as "misinformation" and "disinformation," all in the context of a new disease about which much is still unknown and the science of existing and potential treatments is unsettled.

### Doctor Fitzgibbons

34. Dr. Michael Fitzgibbons is a physician licensed by the Medical Board of California who has been board-certified in internal medicine since 1979 and infectious diseases since 1984.

35. Dr. Fitzgibbons obtained a medical degree from Georgetown University in 1976 and performed his internship, residency in internal medicine, and fellowship in infectious diseases at the University of California, Irvine from 1976 to 1981. He has been in private practice since 1981.

36. Since the onset of the COVID-19 pandemic in 2020, Dr. Fitzgibbons has been concerned about the public-health response to the pandemic and its impact on patient care.

37. Dr. Fitzgibbons is familiar with the standards of care for the treatment required of California physicians concerning the diagnosis and treatment of disease, particularly with respect to infectious diseases.

38. Within the past two years, Dr. Fitzgibbons has personally treated approximately 1000 patients diagnosed with COVID-19, and is familiar with the methods of diagnosing, treating, acquiring, and avoiding COVID-19.

39. During the pandemic, Dr. Fitzgibbons has shared with patients that he believes that there is strong evidence suggesting that the virus causing COVID-19 originated in the Wuhan Institute of Virology Laboratory.

40. Dr. Fitzgibbons has also counseled patients about and prescribed hydroxychloroquine ("HCQ") and azithromycin because both drugs possess anti-inflammatory properties that he believes are beneficial in the treatment of COVID-

19, and because there were early medical reports that suggested potential benefits of the drugs in treating patients with COVID-19.

41. Later in the pandemic, Dr. Fitzgibbons prescribed ivermectin as both a treatment and prophylaxis for patients, and in the instances when he did so, no patient ever complained of an adverse reaction attributed to their use of ivermectin.

42. Use of HCQ and ivermectin to treat COVID-19 were "off-label" uses for those two drugs, meaning that they were not approved by FDA to treat COVID-19. Off-label prescriptions by doctors are common and doctors often use them to treat conditions or illnesses for which the medicine had not been approved by the FDA. Physicians' freedom to prescribe drugs off-label carries important advantages. It permits innovation in clinical practice. Medical advances can and do occur more quickly than the FDA can relabel medications. It offers patients and physicians earlier access to potentially valuable medications and allows physicians to adopt new practices based on emerging evidence. As much as 38% of prescriptions from doctors are "off-label" and the Statute could result in doctors refraining from prescribing potentially beneficial off-label treatments, not just for COVID-19, but for other illnesses or conditions should the legislature expand the scope of the Statute.

43. Dr. Fitzgibbons believes that had the Statute been in effect during the prior two years at the height of the pandemic, his actions and the advice and counsel he provided to patients described above would have jeopardized his medical license.

44. Since the advent of the COVID-19 vaccines, Dr. Fitzgibbons has counseled patients to get vaccinated, but he was and remains opposed to vaccinating children with the current vaccines because he believes that the risks outweigh the benefits. Dr.

Fitzgibbons believes that for certain populations, particularly children, the potential harms from the vaccines exceed that of the disease, and he has communicated this to his patients.

45. Dr. Fitzgibbons believes that the assertions by federal health agencies such as the FDA, CDC, and NIH that the vaccines were safe was generally true, but such assertions should not and did not prevent him from counseling patients regarding potential harmful side-effects of the vaccines.

46. Dr. Fitzgibbons has also advised patients that have contracted COVID-19 that vaccination is superfluous since because he believes natural immunity is as protective if not more protective as the immunity achieved through boosted vaccination.

47. Dr. Fitzgibbons believes that there are and will remain controversies, debates, and disagreements about the treatment of diseases such as COVID-19, cancer, sepsis, and other ailments. The notion of scientific consensus, particularly with respect to a new disease such as COVID-19, is naïve and potentially harmful to patients.

48. Dr. Fitzgibbons has grave concerns about what he can or cannot communicate to his patients now that AB 2098 has been passed and signed into law. Advice and counsel to patients regarding COVID-19 that otherwise was permissible under California law may now be sanctionable under AB 2098. As such, he has a legitimate fear that he could be subject to an onerous investigation and potentially lose his license to practice medicine for simply continuing to provide the type of advice and counsel to patients regarding COVID-19 that he has during the past two years.

## Doctor Couris

49. Dr. Michael Couris is an ophthalmologist licensed by the Medical Board of California who is in solo private practice in San Diego, California.

50. Dr. Couris graduated from the Massachusetts Institute of Technology (MIT) in 1988 and from Georgetown University School of Medicine in 1992. He attended medical school on a Navy Health Professions Scholarship and was commissioned an officer in the United States Navy upon graduation from MIT.

51. Dr. Couris completed a surgical internship at the Naval Medical Center in San Diego, California. Dr. Couris attended the Naval Aerospace Operational Medical Institute and in 1994 was designated a Naval Flight Surgeon.

52. Following several deployments on naval ships and overseas bases, Dr. Couris did an ophthalmology residency at the Naval Medical Center San Diego from 1996 to 1999; and was a staff ophthalmologist at the Naval Medical Center in Portsmouth, Virginia from 1991 to 2001.

53. Dr. Couris resigned his Navy commission in July 2001 and started his private practice. He has been a board member and is currently President of Scripps Mercy Physician Partners Medical Group and is also the Chief Financial Officer of the Mercy Physicians Medical Group.

54. In his ophthalmology practice since 1990, Dr. Couris has treated patients who also suffer from autoimmune diseases. Many of these patients require HCQ to manage their autoimmune condition. There is a small risk of eye damage (maculopathy) from chronic use of HCQ, so biannual eye exams are necessary for such patients. Dr. Couris has not had a single patient using HCQ discontinue its use

because of cardiac side effects and has recommended fewer than 10 patients discontinue use of HCQ due to maculopathy over the last 20 years

55. During the COVID-19 pandemic, a patient of Dr. Couris's who suffered autoimmune disease asked if he could help her refill her prescription for HCQ. Dr. Couris did so, but the Costco pharmacy would not fill the prescription without first speaking with Dr. Couris. Although this was early in the pandemic, Dr. Couris was concerned that the pharmacist might "report" him and perhaps inst0gate a Board investigation.

56. Ophthalmologists have a high risk of contracting COVID-19 because of the proximity of their faces to those of their patients during an exam. Many of his patients ask him about COVID-19 topics routinely. Accordingly, COVID-19 is a topic of which Dr. Couris has been especially mindful.

57. On December 16, 2020, Dr. Couris received the first dose of the Pfizer mRNA vaccine and the second dose in January 16, 2021. Soon after, Dr. Couris suffered a cardiac condition that his doctors diagnosed as arrhythmia. Before this, Dr. Couris had suffered no cardiac conditions and there was no history of cardiac disease in his family. About three weeks after his cardiac diagnosis, Dr. Couris learned of an Israeli study finding that myocarditis was a side effect for men who received an mRNA vaccine.

58. Dr. Couris has spoken with nurses at Children's Hospital in San Diego who informed him that they had seen an increase in the number of pediatric patients admitted for myocarditis and pericarditis following COVID-19 administration. Although anecdotal, Dr. Couris believes this type of information is important to him

1  and other doctors as it may assist spotting early trends and also help inform doctors
2  about how best to advise patients.

3      59.    For patients who inquire, as many of his patients have, Dr. Couris typically
4  advises those age 60 or older to get vaccinated against COVID-19 and to get booster
5  shots at their discretion. He also encourages those with risk factors such as obesity,
6  diabetes or asthma to get vaccinated. Many of his patients ask about their children and
7  grandchildren, and Dr. Couris's standard advice to those patients is that young
8  children should not get the mRNA vaccine.

9      60.    Dr. Couris recommends that patients, both adult and children, interested in
10 the vaccine get the more traditional Novavax vaccine, rather than the mRNA vaccines.

11     61.    Like Dr. Fitzgibbons, Dr. Couris is fearful that the type of information he
12 has provided to patients in the past concerning COVID-19 and that was otherwise
13 permissible under California law prior to AB 2098 would be deemed to fall outside
14 the notion of "scientific consensus" incorporated into the Statute and that if he
15 continues to provide this type of advice and counsel to patients he could face an
16 investigation by the Board and potentially lose his license to practice medicine.

**CAUSES OF ACTION**

**Count I – Violation of the First Amendment**

**(42 U.S.C. § 1983 – Free Speech Clause)**

20     62.    The allegations contained in all the preceding paragraphs are incorporated
21 by reference.

22     63.    The First Amendment of the United States Constitution states, "Congress
23 shall make no law . . . abridging the freedom of speech."

64. The First Amendment is incorporated to apply to the states by the Fourteenth Amendment.

65. The Statute invites arbitrary, subjective and viewpoint discriminatory enforcement.

66. The Statute constitutes an impermissible and unreasonable infringement on the free speech of physicians and surgeons in California on the basis of content and viewpoint of a doctor's speech and imposes professional liability in contravention of the First Amendment.

67. 42 U.S.C. §§ 1983, 1988, and Cal. Civ. Code § 52.1(c) entitle Plaintiffs to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining enforcement of the Statute. Unless Defendants are enjoined from enforcing the Statute, Plaintiffs will suffer irreparable harm.

68. Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(i).

### Count II – The Statute is Void for Vagueness

### (Fourteenth Amendment)

69. The allegations contained in all the preceding paragraphs are incorporated by reference.

70. The Fourteenth Amendment provides ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law."

71. Due process requires that people of ordinary intelligence be able to understand what conduct a given statute, rule or regulation prohibits.

72. Statutes, rules, or regulations that fail to provide this fair notice and clear guidance are void for vagueness.

73. Statutes, rules, or regulations that authorize or even encourage arbitrary or discriminatory enforcement are void for vagueness.

74. Statutes, rules, or regulations implicating and jeopardizing First Amendment rights are required to be especially precise.

75. The Statute subjects doctors licensed in California to investigation and potential discipline, including the loss of their medical license.

76. The Statute does not define the terms "disinformation," "misinformation," "scientific consensus," or "standard of care" with any precision or specificity and therefore does not give licensed doctors like the Plaintiffs clear and adequate notice of what will be considered a violation of the Statute.

77. The Statute imposes an unconstitutionally vague restriction on the speech of doctors such as Plaintiffs. 42 U.S.C. §§ 1983 and 1988 entitle Plaintiffs to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining enforcement of the Statute. Unless Defendants are enjoined from enforcing the Statute, Plaintiffs will suffer irreparable harm.

78. Plaintiffs found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees, as well as reasonable costs of suit, under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(i).

Case No. 22-CV-xxxx
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
18

**Count III – Violation of Article I Section 2(a) of California State Constitution**

**(California Civil Code § 52.1)**

79. The allegations contained in all the preceding paragraphs are incorporated by reference.

80. Defendants deprive Plaintiffs the rights secured to them by the California Constitution. The enforcement of the Statute violates Plaintiffs' right to free speech under Article I, Section 2(a) of the California Constitution. This is a violation of Cal. Civ. Code § 52.1.

81. Plaintiffs found it necessary to engage the services of counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees, as well as reasonable costs of suit, under Cal. Civ. Code § 52.1(i).

**Prayer for Relief**

82. Plaintiffs respectfully request the following relief:

   a. A declaratory judgment that the Statute is an unconstitutional violation of the First Amendment and the California Constitution;

   b. A declaratory judgment that the Statute is unconstitutionally vague under the Fourteenth Amendment;

   c. A preliminary injunction prohibiting Defendants from enforcing the Statute;

   d. A permanent injunction prohibiting Defendants from enforcing the Statute;

   e. An award of attorneys' fees, costs, and expenses; and

   f. Any other legal or equitable relief to which Plaintiffs may be entitled.

Dated: December 6, 2022            Respectfully submitted,

/s/ Theodore H. Frank
Theodore H. Frank (SBN 196332)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org