Rob Bonta
Attorney General of California
Anya M. Binsacca
Edward Kim
Supervising Deputy Attorneys General
Christina Sein Goot
Kristin A. Liska
Deputy Attorneys General
State Bar No. 315994
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3916
  Fax:  (415) 703-5480
  E-mail:  Kristin.Liska@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHAEL COURIS and MICHAEL FITZGIBBONS,** | Case No. 3:22-cv-01922-RSH-JLB |
| Plaintiffs, | |
| v. | **REQUEST FOR JUDICIAL NOTICE** |
| **KRISTINA D. LAWSON, in her official capacity as President of the Medical Board of California; WILLIAM J. PRASIFKA, in his official capacity as Executive Director of the Medical Board of California; and ROBERT BONTA, in his official capacity as Attorney General of California,** | Date:        February 2, 2023<br>Time:        1:30 p.m.<br>Dept:        3B<br>Judge:       The Honorable Robert S. Huie<br>Trial Date:  Not scheduled<br>Date Filed:  12/06/2022 |
| Defendants. | |

Defendants respectfully request that the Court take judicial notice of the public records and facts identified below, which are not subject to reasonable dispute, under Federal Rule of Evidence 201.

A fact is judicially noticeable when it is not subject to reasonable dispute and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Judicial notice is mandatory if "a party requests it" and the court is "supplied with the necessary information." Fed. R. Evid. 201(c)(2). Judicial notice may be taken at any stage of the proceeding. Fed. R. Evid. 201(d); *Papai v. Harbor Tug & Barge Co.*, 67 F.3d 203, 207 n.5 (9th Cir. 1995), *overruled on other grounds*, 520 U.S. 548 (1997). "Legislative history is properly a subject of judicial notice." *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012); *see also, e.g.*, *Chaker v. Crogan*, 428 F.3d 1215, 1233 n.8 (9th Cir. 2005) (taking judicial notice of legislative history of California statute).

Here, Defendants respectfully request that this Court take judicial notice of the following legislative history reports, which are not subject to reasonable dispute (Exhibits A and G are included to provide copies of a historical statute and unpublished judicial decision):

1. **Exhibit A**: A copy of the 1876 Act to Regulate the Process of Medicine in the State of California, recorded at Stat. 1876, ch. 518, pp. 792-794.

2. **Exhibit B**: A copy of the report prepared by the Assembly Committee on Business and Professions on AB 2098 for the April 19, 2022 hearing on the bill.[1]

3. **Exhibit C:** A copy of the report prepared for the Assembly on AB 2098 for the bill's third reading, dated April 20, 2022.

---

[1] Copies of all legislative history reports are available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB2098.

4.     **Exhibit D**:  A copy of the report prepared for the Senate Committee on Business, Professions, and Economic Development on AB 2098 for the June 27, 2022 hearing on the bill.

5.     **Exhibit E**:   A copy of the report prepared for the Senate on AB 2098 for the bill's third reading, dated August 13, 2022.

7.     **Exhibit F:**  A copy of the report prepared for the Assembly on AB 2098 for the vote on the concurrence on Senate Amendments, dated August 22, 2022.

8.     **Exhibit G:**  Order Denying Motion for Preliminary Injunction issued in *McDonald v. Lawson*, No, 22-cv-01805 (C.D. Cal.), issued on December 28, 2022.

Dated:  January 3, 2023                    Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
EDWARD KIM
Supervising Deputy Attorneys General
CHRISTINA SEIN GOOT
Deputy Attorney General

_s/ Kristin Liska_____
KRISTIN A. LISKA
Deputy Attorney General
*Attorneys for Defendants*

2

# INDEX OF EXHIBITS

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | The 1876 Act to Regulate the Process of Medicine in the State of California, recorded at Stat. 1876, ch. 518, pp. 792-794. | 1-3 |
| B | The report prepared by the Assembly Committee on Business and Professions on AB 2098 for the April 19, 2022 hearing on the bill. | 4-16 |
| C | The report prepared for the Assembly on AB 2098 for the bill's third reading, dated April 20, 2022. | 17-22 |
| D | The report prepared for the Senate Committee on Business, Professions, and Economic Development on AB 2098 for the June 27, 2022 hearing on the bill. | 23-34 |
| E | The report prepared for the Senate on AB 2098 for the bill's third reading, dated August 13, 2022. | 35-41 |
| F | The report prepared for the Assembly on AB 2098 for the vote on the concurrence on Senate Amendments, dated August 22, 2022. | 42-47 |
| G | Order Denying Motion for Preliminary Injunction issued in *McDonald v. Lawson*, No, 22-cv-01805 (C.D. Cal.), issued on December 28, 2022. | 48-77 |

# EXHIBIT A

STATUTES OF CALIFORNIA,

CHAP. DXVIII.—*An Act to regulate the practice of medicine in the State of California.*

[Approved April 3, 1876.]

*The People of the State of California, represented in Senate and Assembly, do enact as follows:*

Qualifications of practitioners.

SECTION 1.   Every person practicing medicine in any of its departments shall possess the qualifications required by this Act.  If a graduate in medicine, he shall present his diploma to the Board of Examiners, herein named, for verification as to its genuineness.  If the diploma is found genuine, and if the person named therein be the person claiming and presenting the same, the Board of Examiners shall issue its certificate to that effect, signed by all of the members thereof, and such diploma and certificate shall be conclusive as to the rights of the lawful holder of the same to practice medicine in this State.  If not a graduate, the person practicing medicine in this State shall present himself before said Board, and submit himself to such examinations as the said Board shall require, and if the examination shall be satisfactory to the Examiners the said Board shall issue its certificate in accordance with the facts, and the lawful holder of such certificate shall be entitled to all the rights and privileges herein mentioned.

Examiners, qualifications of.

SEC. 2.   Each State Medical Society incorporated and in active existence on the tenth day of March, eighteen hundred and seventy-six, whose members are required to possess diplomas or licenses from some legally chartered medical institution in good standing, shall appoint, annually, a Board of Examiners, consisting of seven members, who shall hold their office for one year, and until their successors shall be chosen.   The Examiners so appointed shall go before a County Judge and make oath that they are regular graduates and licentiates, and that they will faithfully perform the duties of their office.  Vacancies occurring in a Board of Examiners shall be filled by the society appointing it, by the selection of alternates or otherwise.

Powers and duties of Examiners.

SEC. 3.   The Board of Examiners shall organize within three months after the passage of this Act.   They shall procure a seal, and shall receive, through their Secretary, applications for certificates and examinations.   The President of each Board shall have authority to administer oaths, and the Board take testimony in all meetings relating to their duties.   They shall issue certificates to all who furnish satisfactory proof of having received diplomas or licenses from legally chartered medical institutions in good standing.  They shall prepare two forms of certificates, one for persons in possession of diplomas or licenses, the other for candidates examined by the Board.   They shall furnish to the County Clerks of the several counties a list of all persons receiving certificates.   In selecting places to hold their meetings, they shall, as far as is reasonable, accommodate applicants residing in different sections of the State, and due notice shall be

published of all their meetings.  Certificates shall be signed by all the members of the Board granting them, and shall indicate the medical society to which the Examining Board is attached.

SEC. 4.  Said Board of Examiners shall examine diplomas **Same, fees.** as to their genuineness, and if the diploma shall be found genuine as represented, the Secretary of the Board of Examiners shall receive a fee of one dollar from each graduate or licentiate, and no further charge shall be made to the applicants; but if it be found to be fraudulent or not lawfully owned by the possessor, the Board shall be entitled to charge and collect twenty dollars of the applicant presenting such diplomas.  The verification of the diplomas shall consist in the affidavit of the holder and applicant, that he is the lawful possessor of the same, and that he is the person therein named; such affidavit may be taken before any person authorized to administer oaths, and the same shall be attested under the hand and official seal of such officer, if he have a seal.  Graduates may present their diplomas and affidavits, as provided in this Act, by letter or by proxy, and the Board of Examiners shall issue its certificate the same as though the owner of the diploma was present.

SEC. 5.  All examinations of persons not graduates or **Examination of applicants.** licentiates shall be made directly by the Board, and the certificates given by the Boards shall authorize the possessor to practice medicine and surgery in the State of California; but no examination into the qualifications of persons not holding diplomas or licenses shall be made after the thirty-first day of December, eighteen hundred and seventy-six. After that date no certificates shall be granted by them, except to persons presenting diplomas or licenses from legally chartered medical institutions in good standing.

SEC. 6.  Every person holding a certificate from a Board **Certificates to be recorded.** of Examiners shall have it recorded in the office of the Clerk of the county in which he resides, and the record shall be indorsed thereon.  Any person removing to another county to practice shall procure an indorsement to that effect on the certificate from the County Clerk, and shall record the certificate in like manner in the county to which he removes, and the holder of the certificate shall pay to the County Clerk the usual fees for making the record.

SEC. 7.  The County Clerk shall keep, in a book provided **Clerk to keep register.** for the purpose, a complete list of the certificates recorded by him, with the date of issue and the name of the medical society represented by the Board of Examiners issuing them. If the certificate be based on a diploma or license he shall record the name of the medical institution conferring it, and the date when conferred.  The register of the County Clerk shall be open to public inspection during business hours.

SEC. 8.  Candidates for examination shall pay a fee of five **Fees for examination.** dollars in advance, which shall be returned to them if a certificate be refused.  The fees received by the Board shall be paid into the treasury of the medical society by which the Board shall have been appointed, and the expenses and

794                    STATUTES OF CALIFORNIA,

compensation of the Board shall be subject to arrangement with the society.

**Examinations.**

SEC. 9.   Examinations may be in whole or in part in writing, and shall be of an elementary and practical character, but sufficiently strict to test the qualifications of the candidate as a practitioner.

**Refusal and revocation of certificates.**

SEC. 10.   The Boards of Examiners may refuse certificates to individuals guilty of unprofessional or dishonorable conduct, and they may revoke certificates for like causes.   In all cases of refusal or revocation the applicant may appeal to the body appointing the Board.

**Definition of "physician."**

SEC. 11.   Any person shall be regarded as practicing medicine, within the meaning of this Act, who shall profess publicly to be a physician and to prescribe for the sick, or who shall append to his name the letters of "M. D."   But nothing in this Act shall be construed to prohibit students from prescribing under the supervision of preceptors, or to prohibit gratuitous services in cases of emergency.   And this Act shall not apply to commissioned surgeons of the United States army and navy practicing within the limits of this State.

**Licenses.**

SEC. 12.   Any itinerant vender of any drug, nostrum, ointment, or appliance of any kind intended for the treatment of disease or injury, or who shall, by writing or printing, or any other method, publicly profess to cure or treat diseases, injury or deformity, by any drug, nostrum, manipulation, or other expedient, shall pay a license of one hundred dollars a month, to be collected in the usual way.

**Penalties for violation.**

SEC. 13.   Any person practicing medicine or surgery in this State without complying with the provisions of this Act, shall be punished by a fine of not less than fifty dollars ($50) nor more than five hundred dollars ($500), or by imprisonment in the County Jail for a period of not less than thirty days nor more than three hundred and sixty-five days, or by both such fine and imprisonment for each and every offense.   And any person filing, or attempting to file, as his own, the diploma or certificate of another, or a forged affidavit of identification, shall be guilty of a felony, and upon conviction shall be subject to such fine and imprisonment as are made and provided by the statutes of this State for the crime of forgery.

SEC. 14.   This Act shall take effect from and after its passage, but the penalties shall not be enforced till on and after the thirty-first day of December, eighteen hundred and seventy-six.

———

CHAP. DXIX.—*An Act for the relief of J. J. Conlin.*

[Approved April 3, 1876.]

*The People of the State of California, represented in Senate and Assembly, do enact as follows:*

**Claims allowed.**

SECTION 1.   The Board of Supervisors of the City and County of San Francisco is hereby authorized to appropriate

# EXHIBIT B

AB 2098
Page 1

Date of Hearing: April 19, 2022

ASSEMBLY COMMITTEE ON BUSINESS AND PROFESSIONS
Marc Berman, Chair
AB 2098 (Low) – As Introduced February 14, 2022

**SUBJECT:** Physicians and surgeons:  unprofessional conduct.

**SUMMARY:** Expressly provides that the dissemination of misinformation or disinformation related to COVID-19 by physicians and surgeons constitutes unprofessional conduct.

**EXISTING LAW:**

1) Enacts the Medical Practice Act, which provides for the licensure and regulation of physicians and surgeons.  (Business and Professions Code (BPC) §§ 2000 *et seq.*)

2) Establishes the Medical Board of California (MBC), a regulatory board within the Department of Consumer Affairs (DCA) comprised of 15 appointed members.  (BPC § 2001)

3) Enacts the Osteopathic Act, which provides for the licensure and regulation of osteopathic physicians and surgeons.  (BPC §§ 2450 *et seq.*)

4) Establishes the Osteopathic Medical Board of California (OMBC), which regulates osteopathic physicians and surgeons who possess effectively the same practice privileges and prescription authority as those regulated by MBC but with a training emphasis on diagnosis and treatment of patients through an integrated, whole-person approach.  (BPC § 2450)

5) Provides that protection of the public shall be the highest priority for both the MBC and the OMBC in exercising their respective licensing, regulatory, and disciplinary functions, and that whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount.  (BPC § 2001.1; § 2450.1)

6) Entrusts the MBC with responsibility for, among other things, the enforcement of the disciplinary and criminal provisions of the Medical Practice Act; the administration and hearing of disciplinary actions; carrying out disciplinary actions appropriate to findings made by a panel or an administrative law judge; suspending, revoking, or otherwise limiting certificates after the conclusion of disciplinary actions; and reviewing the quality of medical practice carried out by physician and surgeon certificate holders under the jurisdiction of the board.  (BPC § 2004)

7) Authorizes the MBC to appoint panels of at least four of its members for the purpose of fulfilling its disciplinary obligations and provides that the number of public members assigned to a panel shall not exceed the number of licensed physician and surgeon members. (BPC § 2008)

8) With approval from the Director of Consumer Affairs, authorizes the MBC to employ an executive director as well as investigators, legal counsel, medical consultants, and other assistance, but provides that the Attorney General is legal counsel for the MBC in any judicial and administrative proceedings.  (BPC § 2020)

9)  Allows the MBC to select and contract with necessary medical consultants who are licensed physicians to assist it in its programs.  (BPC § 2024)

10) Empowers the MBC to take action against persons guilty of violating the Medical Practice Act.  (BPC § 2220)

11) Requires the Director of Consumer Affairs to appoint an independent enforcement monitor no later than March 1, 2022 to monitor the MBC's enforcement efforts, with specific concentration on the handling and processing of complaints and timely application of sanctions or discipline imposed on licensees and persons in order to protect the public.  (BPC § 2220.01)

12) Requires the MBC to prioritize its investigative and prosecutorial resources to ensure that physicians representing the greatest threat of harm are identified and disciplined expeditiously, with allegations of gross negligence, incompetence, or repeated negligent acts that involve death or serious bodily injury to one or more patients receiving the highest priority.  (BPC § 2220.05)

13) Clarifies that the MBC is the only licensing board that is authorized to investigate or commence disciplinary actions relating to the physicians it licenses.  (BPC § 2220.5)

14) Provides that a licensee whose matter has been heard by an administrative law judge, or whose default has been entered, and who is found guilty, or who has entered into a stipulation for disciplinary action with the MBC, may be subject to various forms of disciplinary action. (BPC § 2227)

15) Provides that all proceedings against a licensee for unprofessional conduct, or against an applicant for licensure for unprofessional conduct or cause, shall be conducted in accordance with the Administrative Procedure Act.  (BPC § 2230)

16) Requires the MBC to take action against any licensee who is charged with unprofessional conduct, which includes, but is not limited to, the following:

   a)  Violating or aiding in the violation of the Medical Practice Act.

   b)  Gross negligence.

   c)  Repeated negligent acts.

   d)  Incompetence.

   e)  The commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician.

   f)  Any action or conduct that would have warranted the denial of a certificate.

   g)  The failure by a physician, in the absence of good cause, to attend and participate in an investigatory interview by the MBC.

   (BPC § 2234)

17) Provides that a physician shall not be subject to discipline solely on the basis that the treatment or advice they rendered to a patient is alternative or complementary medicine if that treatment or advice was provided after informed consent and a good-faith prior examination; was provided after the physician provided the patient with information concerning conventional treatment; and the alternative complementary medicine did not cause a delay in, or discourage traditional diagnosis of, a condition of the patient, or cause death or serious bodily injury to the patient.  (BPC § 2234.1)

18) Provides that the conviction of any offense substantially related to the qualifications, functions, or duties of a physician constitutes unprofessional conduct.  (BPC § 2236)

19) Provides that violating a state or federal law regulating dangerous drugs or controlled substances, constitutes unprofessional conduct.  (BPC §§ 2237 − 2238)

20) Provides that self-prescribing of a controlled substance, or the use of a dangerous drug or alcoholic beverages to the extent that it is dangerous or injurious to the physician or any other person, or impairs the physician's ability to practice, constitutes unprofessional conduct. (BPC § 2239)

21) Provides that prescribing, dispensing, or furnishing dangerous drugs without an appropriate prior examination and a medical indication constitutes unprofessional conduct.  (BPC § 2242)

22) Provides that the willful failure to comply with requirements relating to informed consent for sterilization procedures constitutes unprofessional conduct.  (BPC § 2250)

23) Provides that the prescribing, dispensing, administering, or furnishing of liquid silicone for the purpose of injecting such substance into a human breast or mammary constitutes unprofessional conduct.  (BPC § 2251)

24) Provides that the violation of an injunction or cease and desist order relating to the treatment of cancer constitutes unprofessional conduct.  (BPC § 2252)

25) Provides that failure to comply with the Reproductive Privacy Act governing abortion care constitutes unprofessional conduct.  (BPC § 2253)

26) Provides that the violation of laws relating to research on aborted products of human conception constitutes unprofessional conduct.  (BPC § 2254)

27) Provides that the violation of laws relating to the unlawful referral of patients to extended care facilities constitutes unprofessional conduct.  (BPC § 2255)

28) Provides that any intentional violation of laws relating to the rights of involuntarily confined inpatients constitutes unprofessional conduct.  (BPC § 2256)

29) Provides that the violation of laws relating to informed consent for the treatment of breast cancer constitutes unprofessional conduct.  (BPC § 2257)

30) Provides that the violation of laws relating to the use of laetrile or amygdalin with respect to cancer therapy constitutes unprofessional conduct.  (BPC § 2258)

31) Provides that failing to give a patient a written summary prior to silicone implants being used in cosmetic, plastic, reconstructive, or similar surgery constitutes unprofessional conduct. (BPC § 2259)

32) Provides that failing to give a patient a written summary prior to collagen injections being used in cosmetic, plastic, reconstructive, or similar surgery constitutes unprofessional conduct. (BPC § 2259.5)

33) Provides that any violation of extraction and postoperative care standards constitutes unprofessional conduct. (BPC § 2259.7)

34) Provides that the removal of sperm or ova from a patient without written consent constitutes unprofessional conduct. (BPC § 2260)

35) Provides that the violation of laws relating to human cloning constitutes unprofessional conduct. (BPC § 2260.5)

36) Provides that knowingly making or signing any certificate related to the practice of medicine which falsely represents the existence or nonexistence of a state of facts constitutes unprofessional conduct. (BPC § 2261)

37) Provides that altering or modifying the medical record of any person, with fraudulent intent, or creating any false medical record, with fraudulent intent, constitutes unprofessional conduct. (BPC § 2262)

38) Provides that numerous other inappropriate activities or violations of the law constitute unprofessional conduct. (BPC §§ 2263 – 2318)

39) Requires that licensees be given notification of proposed actions to be taken against the licensee by the MBC and be given the opportunity to provide a statement to the deputy attorney general assigned to the case. (BPC § 2330)

**THIS BILL:**

1) Provides that the dissemination or promotion of misinformation or disinformation related to COVID-19 by a physician and surgeon constitutes unprofessional conduct.

2) Includes false or misleading information regarding the nature and risks of the COVID-19 virus, its prevention and treatment, and the development, safety, and effectiveness of COVID-19 vaccines as types of misinformation or disinformation that could be disseminated.

3) Requires the MBC or OMBC to consider the following factors prior to bringing a disciplinary action against a licensee for disseminating misinformation or disinformation:

   a) Whether the licensee deviated from the applicable standard of care.

   b) Whether the licensee intended to mislead or acted with malicious intent.

   c) Whether the misinformation or disinformation was demonstrated to have resulted in an individual declining opportunities for COVID-19 prevention or treatment that was not justified by the individual's medical history or condition.

    d) Whether the misinformation or disinformation was contradicted by contemporary scientific consensus to an extent where its dissemination constitutes gross negligence by the licensee.

4) Defines "physician and surgeon" as a person licensed by either the MBC or the OMBC.

5) Provides that violators of the bill's provisions are not guilty of a misdemeanor.

6) Makes various findings and declarations in support of the bill.

**FISCAL EFFECT:** Unknown; this bill is keyed fiscal by the Legislative Counsel.

**COMMENTS:**

**Purpose.** This bill is sponsored by the **California Medical Association**.  According to the author:

> "AB 2098 is crucial to addressing the amplification of misinformation and disinformation related to the COVID-19 pandemic. Licensed physicians, doctors, and surgeons possess a high degree of public trust and therefore must be held accountable for the information they spread. Providing patients with accurate, science-based information on the pandemic and COVID-19 vaccinations is imperative to protecting public health. By passing this legislation, California will show its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

**Background.**

*COVID-19 Pandemic and Vaccines.*  To date, over 984,000 people have died of COVID-19 in the United States, including approximately 90,000 Californians.[1]  On March 4, 2020, Governor Gavin Newsom proclaimed a State of Emergency as a result of the impacts of the COVID-19 public health crisis, and on March 19, 2020, the Governor formally issued a statewide "stay at home order," directing Californians to only leave the house to provide or obtain specified essential services.  Subsequent guidance from the State Public Health Officer expressly exempted from that order various professionals regulated by the Department of Consumer Affairs (DCA), including physicians and surgeons providing essential care.

On March 30, 2020, Governor Newsom announced an initiative to "expand California's health care workforce and recruit health care professionals to address the COVID-19 surge" and signed Executive Order N-39-20.  This executive order established a waiver request process under the DCA and included other provisions authorizing the waiver of licensing, certification, and credentialing requirements for health care providers.  Through this waiver process, the DCA issued a series of waivers of law to authorize various healing arts professionals to order and administer COVID-19 vaccines.  These waivers aligned with similar authority granted federally under the Public Readiness and Emergency Preparedness (PREP) Act for Medical Countermeasures Against COVID-19.

---

[1] Data current as of April 11, 2022; the number of Californians who have died from causes related to COVID-19 has risen 20 percent since this bill was introduced with its current findings and declarations.

Vaccines are regulated and overseen by multiple federal entities responsible for ensuring their safety and efficacy.  The federal Food and Drug Administration (FDA) is initially responsible for approving new drugs, determining both that they are safe to administer and that their recommended use is clinically supported.  During states of emergency, the FDA may expedite their review through the Emergency Use Authorization (EUA) process to accelerate the availability of new immunizations or treatments.  Currently, three vaccines have been approved through the EUA process for COVID-19.  These vaccines have additionally been reviewed and found safe by national experts participating in a Western States Scientific Safety Review Workgroup.  Data has continued to show that the risks of infection, hospitalization, and death for vaccinated individuals are dramatically lower than for those who have not been vaccinated.[2]

*Misinformation and Disinformation.*  This bill is intended to target three types of false or misleading information relating to the COVID-19 pandemic.  First, the language refers to nonfactual information regarding "the nature and risks of the virus"—for example, misleadingly comparing COVID-19 to less serious conditions or inaccurately characterizing the deadliness of the disease.  Second, the bill seeks to address false statements regarding its "prevention and treatment"—this would presumably include the promotion of treatments and therapies that have no proven effectiveness against the virus.  The third category is for misinformation or disinformation regarding "the development, safety, and effectiveness of COVID-19 vaccines."

Public skepticism and misunderstanding of diseases, treatments, and immunizations is not unique to COVID-19.  The earliest known group formed to oppose vaccination programs, the National Anti-Vaccination League, was established in the United Kingdom in 1866 following a series of violent protests against mandatory smallpox immunizations in the Vaccination Act of 1853.[3]  In 1918, conspiracy theories were circulated that the Spanish Flu pandemic was a deliberate act of biological warfare, spread through aspirin manufactured by German company Bayer.[4]

What has been historically unprecedented about the dissemination of misinformation and disinformation throughout the COVID-19 pandemic is the omnipresence of media coverage and the prevalence of social media.  False information can easily be spread to millions within days or even hours of it being created.  It can become challenging for a population already feeling overloaded with complex information to differentiate between thoroughly researched, accurate reporting and information that is oversimplified, unproven, or patently false.[5]

A substantial factor in the spread of false information is a phenomenon known as "confirmation bias."  When individuals hold a preexisting belief or suspicion, they will often unconsciously seek out information to validate that predisposition and filter out contradictory evidence.[6]  The persistence of modern media exposure and the internet has exacerbated this effect, as information seeming to support virtually any viewpoint or understanding can now easily be found through the use of search engines and social media.  Many websites further exacerbate the issue of confirmation bias by algorithmically delivering consistent information to users who have demonstrated a pattern of belief or ideology.

---

[2] Dyer, Owen. "COVID-19: Unvaccinated face 11 times risk of death from delta variant, CDC data show." *BMJ (Clinical research ed.)* vol. 374 (2021).
[3] Wolfe, Robert M. "Anti-vaccinationists past and present." *BMJ (Clinical research ed.)* vol. 325 (2002).
[4] Johnson, Norman A. "The 1918 flu pandemic and its aftermath." *Evo Edu Outreach* 11, 5 (2018).
[5] Nelson, Taylor. "The Danger of Misinformation in the COVID-19 Crisis." *Missouri medicine vol. 117*, 6 (2020).
[6] Nickerson, Raymond S. "Confirmation bias: A ubiquitous phenomenon in many guises." *Review of General Psychology*, 2 (1998).

The role of physicians and other health professionals in legitimizing false information during the COVID-19 pandemic has presented serious implications for public safety. For example, the federal Centers for Disease Control and Prevention (CDC) has for decades been recognized as the United States government's primary agency for protecting Americans through expert research and advice related to the control and prevention of communicable disease. The CDC has consistently warned Americans about the threat of COVID-19 and strongly encouraged vaccination. However, throughout the pandemic, many individuals who are predisposed toward skepticism of the government and incredulity toward vaccines have sought to validate those views, despite unambiguous guidance to the contrary from leading health experts.

As a result, health practitioners whose views on COVID-19 and immunization against it are within the extreme minority for their profession are armed with a disproportionately loud voice in the public discourse. Antigovernment cynics and vaccine skeptics cohere to the opinions of those few physicians who will reinforce their beliefs as they seek to appeal to authority in service of their confirmation bias.[7] The effect of this is that a relatively small group of public health contrarians who are licensed as physicians will be afforded the same, if not more, credibility as long-trusted public institutions like the CDC, the FDA, and the American Medical Association, even if those physicians do not specialize in epidemiology or infectious disease prevention.

The incongruity of this reasoning is frequently rationalized in part through conspiracy theories about the medical establishment. This is not novel. When allopathic medicine first achieved dominance during the Progressive Era, there were many who vilified the medical system as financially motivated, accusing "modern medicine men" of oppressing natural therapies in order to profit from a monopoly on health care practice.[8] Other related conspiracy theories frequently involve the United States government, which has been accused of everything from inventing or exaggerating the pandemic to suppressing natural remedies, or even using COVID-19 vaccines as a clandestine method for implanting microchips into Americans.[9]

*Role of State Medical Boards.* Physicians and surgeons in California are regulated by one of two entities: the Medical Board of California (MBC) or the Osteopathic Medical Board of California (OMBC). The MBC licenses and regulates about 153,000 physicians while the OMBC licenses and regulates slightly over 12,000. Despite receiving different forms of medical education and being overseen by separate boards, the essential scope of practice for these two categories of licensees are virtually identical.

In July of 2021, the Federation of State Medical Boards (FSMB) issued a statement positioned as being "in response to a dramatic increase in the dissemination of COVID-19 vaccine misinformation and disinformation by physicians and other health care professionals on social media platforms, online and in the media." The FSMB warned that physicians who engage in the spread of false information related to COVID-19 were jeopardizing their licenses to practice medicine. While physicians are subject to discipline only by boards located in states where they hold a license, the FSMB's statement was viewed as a serious warning to doctors that they risked disciplinary action if they engaged in spreading inaccurate information.

---

[7] Topf, Joel M., and Williams, Paul N. "COVID-19, social media, and the role of the public physician." *Blood Purification* 50.4-5 (2021).
[8] Burrow, JG. *Organized Medicine in the Progressive Era: The Move Toward Monopoly*. Baltimore, MD: Johns Hopkins University Press (1977).
[9] Rubin, Rita. "When Physicians Spread Unscientific Information About COVID-19." *JAMA* 327 (2002).

Following the FSMB's statement, some state medical boards appeared poised to take action against licensees found to be spreading misinformation or disinformation. Tennessee's Board of Medical Examiners adopted the FSMB's statement as their own. However, in response, the state's Republican legislature threatened to disband the board if it sought to take any such action against a physician. Legislation in at least fourteen states has been introduced to prevent medical boards from holding physicians who spread false information accountable in accordance with the FSMB's guidance.[10]

In contrast to legislative action taken in those states, this bill would seek to confirm that in California, physicians who disseminate COVID-19 misinformation or disinformation are indeed subject to formal discipline. The bill would expressly establish that such dissemination would constitute "unprofessional conduct"—a term used prolifically in the Medical Practice Act as a general description of numerous forms of conduct for which disciplinary action may be taken. The MBC or OMBC would be required to consider multiple factors prior to filing an accusation, but would ultimately be authorized to take enforcement action against physicians who have used their licenses to jeopardize public health and safety through the spread of false information.

It is certainly meaningful that this bill would establish as a matter of California law that physicians are subject to discipline for spreading false information. However, it is more than likely that the MBC and OMBC are both already fully capable of bringing an accusation against a physician for this type of misconduct. For example, the Medical Practice Act includes "gross negligence" and "repeated negligent acts" within the meaning of unprofessional conduct, representing situations where the physician deviated from the standard of care in the opinion of the MBC and its expert medical reviewers.

If, for example, a physician were to advise patients to inject disinfectant as a way of treating COVID-19—as former President Trump once did, resulting in a sharp rise in reported incidents of misusing bleach and other cleaning products[11]—disseminating that "misinformation" would almost certainly be considered negligent care subject to discipline. Whether a case of spreading misinformation is sufficient to bring an action for gross negligence would be evaluated using the MBC's expert reviewer guidelines, which provide that "the determining factor is the *degree* of departure from the applicable standard of care." Similarly, it is arguable that spreading "disinformation" as commonly defined would constitute an "act of dishonesty or corruption"—also statutorily included within the Medical Practice Act's meaning of unprofessional conduct.

Those in opposition to this bill have expressed concern that the MBC would overzealously prosecute doctors for expressing views that are outside the mainstream but not indisputably unreasonable based on the physician's research and training. This apprehension cannot easily be reconciled with persistent criticisms levied against the MBC by the Legislature and patient safety advocates, who have repeatedly reproved the board for its underwhelming enforcement activities. Major news editorials have pointed out that the MBC only takes formal disciplinary action in about three percent of cases, and that more than 80 percent of complaints are dismissed without investigation. As the Legislature persists in its admonishment of the MBC for failing to take aggressive action against physicians who commit unprofessional conduct, it would appear dubious that the board would excessively utilize the authority expressly provided by this bill.

---

[10] https://www.audacy.com/wccoradio/news/national/laws-are-stopping-medical-boards-from-punishing-doctors
[11] Gharpure, Radhika. "Knowledge and Practices Regarding Safe Household Cleaning and Disinfection for COVID-19 Prevention." *Morbidity and Mortality Weekly Report*, 69 (2020).

It stands to reason that Californians who have demonstrated suspicion toward both the medical establishment and their government would be slow to trust the MBC, with a majority of its members consisting of physicians appointed by the Governor. However, the degree of enmity recently exhibited by physicians and others opposed to COVID-19 prevention policies could be viewed as disturbing. In December of 2021, it was reported that representatives of an anti-vaccination organization called America's Frontline Doctors had stalked and intimidated Kristina Lawson, President of the MBC.[12] This harassment was escalated in April of 2022 when that same organization "released a 21-minute video that depicts Lawson in Nazi regalia, a whip in her hand and swastika on her shoulder, and shows a clip of the garage confrontation validating Lawson's description."[13]

America's Frontline Doctors was founded by Dr. Simone Gold, who holds an active license in California as a physician. Dr. Gold and her organization have vociferously promoted hydroxychloroquine as a COVID-19 treatment, despite evidence increasingly showing it to be ineffective and potentially unsafe.[14] Dr. Gold has engaged in multiple campaigns to stoke public distrust in COVID-19 vaccines, characterizing them as "experimental" despite numerous safety and efficacy trials successfully confirming their safety and efficacy.[15] Dr. Gold spoke at a rally held in conjunction with the attempted insurrection on the United States Capitol on January 6, 2021; she was arrested and subsequently pleaded guilty to a misdemeanor relating to that event.

Despite what would appear to be repeated conduct perpetrated by Dr. Gold involving the dissemination of false information regarding COVID-19, Dr. Gold's license remains active with the MBC and there appears to be no record of any disciplinary action taken against her.[16] Given the air of legitimacy she sustains from her status as a licensed physician, Dr. Gold likely serves as an illustrative example of the type of behavior that the author of this bill seeks to unequivocally establish as constituting unprofessional conduct for physicians in California. Regardless of whether similar authority is already available to the MBC through other enforceable provisions in the Medical Practice Act, it is understandable that the author desires to make this authority explicit and confirm that doctors licensed in California who disseminate misinformation or disinformation should be held fully accountable.

**Current Related Legislation.** AB 1636 (Weber) would prohibit the MBC from granting or reinstating physician certificates to individuals who commit sexual misconduct and require the MBC to revoke the licenses of physicians to commit such misconduct. *This bill is pending in this committee.*

AB 1767 (Boerner Horvath) would remove licensed midwives from the jurisdiction of the MBC and establish a new board to license and regulate that profession. *This bill is pending in this committee.*

AB 2060 (Quirk) would change the membership composition of the MBC so that a majority of the board consists of public members. *This bill is pending in this committee.*

---

[12] https://www.latimes.com/business/story/2021-12-10/covid-anti-vax-confrontations
[13] https://www.latimes.com/business/story/2022-04-06/covid-anti-vaxxers-campaign-against-public-health-advocates-gets-more-extreme
[14] Singh, Bhagteshwar. "Chloroquine or hydroxychloroquine for prevention and treatment of COVID-19." *The Cochrane database of systematic reviews vol. 2,* 2 (2021).
[15] https://www.medpagetoday.com/infectiousdisease/covid19/90536
[16] https://search.dca.ca.gov/details/8002/G/70224/595d067c562f072a5e7b25c913b285cf

**Prior Related Legislation.** SB 806 (Roth, Chapter 649, Statutes of 2021) extended the sunset date for the MBC until January 1, 2023 and made numerous reforms to the Medical Practice Act.

AB 1909 (Gonzalez) would have provided that performing an examination on a patient for the purpose of determining whether the patient is a virgin constitutes unprofessional conduct. *This bill was not presented for a vote in this committee.*

AB 1278 (Nazarian) would have provided that failing to post an Open Payments database notice constitutes unprofessional conduct. *This bill was held on the Assembly Appropriations Committee's suspense file.*

SB 1448 (Hill, Chapter 570, Statutes of 2018) requires physicians and surgeons, osteopathic physicians and surgeons, podiatrists, acupuncturists, chiropractors and naturopathic doctors to notify patients of their probationary status beginning July 1, 2019.

**ARGUMENTS IN SUPPORT:**

The **California Medical Association** (CMA) is sponsoring this bill. According to the CMA: "The COVID-19 pandemic has unfortunately led to increasing amounts of misinformation and disinformation related to the disease including how the virus is transmitted, promoting untested treatments and cures, and calling into question public health efforts such as masking and vaccinations. Many health professionals, including physicians, have been the culprits of this misinformation and disinformation effort." The CMA goes on to argue that "while the MBC may have the ability to discipline licensees for unprofessional conduct under Business and Professions Code section 2234, AB 2098 makes clear that the MBC has the statutory authority to take such actions against physicians that spread COVID-19 misinformation or disinformation."

The **American Academy of Pediatrics, California** is in support of this bill, writing: "Licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. When they choose to spread inaccurate information, physicians contradict their responsibilities and further erode public trust in the medical profession. By passing this bill, California will demonstrate its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

**ARGUMENTS IN OPPOSITION:**

**A Voice for Choice Advocacy** opposes this bill, writing: "While we agree that physicians and surgeons should be disciplined for maliciously sharing misinformation and disinformation, there are already measures in place for the California Medical Board to discipline for such offenses. Furthermore, AB 2098 is overly broad and would be impossible to implement because there is no definition and no established 'standard of care' or 'contemporary scientific consensus' for treating SARS-COV-2/COVID-19."

**Californians for Good Governance** opposes this bill "based on concerns about its unconstitutional restrictions on free speech." The organization argues that "while the state may be able to claim that providing the public with accurate information regarding Covid-19 is a compelling interest, it cannot possibly argue that the blunt weapon that AB 2098 represents is narrowly tailored to that interest." The organization further states that "in a country such as ours, which was established on the foundation of civil liberties such as free speech, the truth is something hashed out in the marketplace of ideas, rather than dictated by the government."

**POLICY ISSUE(S) FOR CONSIDERATION:**

*Lack of Definitions.*  The intent of this bill is made clear in the subdivision providing that "it shall constitute unprofessional conduct for a physician and surgeon to disseminate or promote misinformation or disinformation related to COVID-19."  However, the terms "misinformation," "disinformation," and "disseminate" are not defined.  Provisions outlining what factors the MBC or OMBC must consider prior to bringing a disciplinary action do suggest how false information should be deemed enforceable under the bill, with some of the language taken directly from definitions provided by the CDC on its public guidance regarding misinformation and disinformation.[17]  To ensure greater clarity with regards to how this bill should be interpreted and implemented by the MBC and the OMBC within their existing enforcement architecture, the author should consider amendments restructuring the bill to provide for clearer definitions.

*Constitutionality.*  Many of the opposition arguments regarding this bill have revolved around the concept of "free speech" and whether a state law penalizing physicians for conveying information determined to be false is lawful under the United States Constitution.   It is certainly true that the First Amendment prohibits laws "abridging the freedom of speech."  However, the Supreme Court of the United States has repeatedly confirmed that this constitutional right is not absolute.

A key factor in determining whether a statute like the one proposed in this bill violates the First Amendment is whether the law would in fact regulate professional *speech* as opposed professional *conduct*.  The United States Court of Appeals for the Ninth Circuit discussed this distinction extensively in its decision upholding the constitutionality of California's ban on licensed health professionals providing therapies intended to change a patient's sexual orientation or identity.[18]  That decision noted that "doctor-patient communications *about* medical treatment receive substantial First Amendment protection, but the government has more leeway to regulate the conduct necessary to administering treatment itself."

To illustrate the critical difference between the regulation of professional speech versus professional conduct, the Ninth Circuit suggested that the issue be viewed "along a continuum."  First, the Ninth Circuit stated that "where a professional is engaged in a public dialogue, First Amendment protection is at its greatest.  Thus, for example, a doctor who publicly advocates a treatment that the medical establishment considers outside the mainstream, or even dangerous, is entitled to robust protection under the First Amendment—just as any person is—even though the state has the power to regulate medicine."

The Ninth Circuit then suggested that "at the midpoint of the continuum, within the confines of a professional relationship, First Amendment protection of a professional's speech is somewhat diminished."  As an example, the decision cited *Planned Parenthood v. Casey*, in which the Supreme Court upheld a requirement that doctors disclose truthful, nonmisleading information to patients about certain risks of abortion.  In this case, the Supreme Court ruled that "the physician's First Amendment rights not to speak are implicated, but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State."[19]

---

[17] https://www.cdc.gov/vaccines/covid-19/health-departments/addressing-vaccine-misinformation.html
[18] *Pickup v. Brown*, 728 F.3d 1042 (2015).
[19] *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992).

The Ninth Circuit ultimately ruled that California's ban on gay conversion therapy fell at the far end of the continuum, in that it consisted of "the regulation of professional conduct, where the state's power is great, even though such regulation may have an incidental effect on speech." The ruling explained that while much of the practice of medicine requires speech to effectuate treatment and therapy in the form of prescriptions, recommendations, and counseling, this is incidental to the regulation of professional conduct, which is the core purpose of all state and federal license requirements. The Supreme Court declined to grant review of the Ninth Circuit's decision, and the California law remains in effect.

A recent decision issued by the Supreme Court in *National Institute of Family and Life Advocates v. Becerra*—which declared that a California law requiring crisis pregnancy centers to make disclosures about pregnancy options was unconstitutional—has frequently been cited as a key precedent for determining whether state laws implicating professional speech are impermissible under the First Amendment.[20] In that decision, the Supreme Court declined to recognize the Ninth Circuit's treatment of "professional speech" as a separate category afforded less protection than other forms of speech. However, the Supreme Court did affirm that "states may regulate professional conduct, even though that conduct incidentally involves speech."

Whether this bill would be considered constitutionally valid would in large part depend on how it is interpreted and enforced. If the MBC or the OMBC were to take action against a physician for statements made to the general public about COVID-19 through social media or at a public protest, a court may find that this speech falls at the end of the spectrum where the First Amendment's protections are strongest. However, if a physician were to be subjected to formal discipline for communications made to a patient under their care in the form of treatment or advice, this would quite likely be considered professional conduct that may be more heavily regulated through the state's police power.

**AMENDMENTS:**

1) To clarify the meaning of terms used in the bill to align with the boards' existing authority to regulate professional conduct, insert the following provisions to the definitions contained in subdivision (c):

> *(3) "Misinformation" means false information that is contradicted by contemporary scientific consensus to an extent where its dissemination constitutes gross negligence by the licensee.*

> *(4) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.*

> *(5) "Disseminate" means the communication of information from the licensee to a patient under the licensee's care in the form of treatment or advice.*

2) To reflect that much of the language currently provided as factors for a board to consider has been relocated to the bill's definitions, strike the current subdivision (b) and insert the following:

---

[20] *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. ___ (2018).

*(b) Prior to bringing a disciplinary action against a licensee under this section, the board shall consider both whether the licensee departed from the applicable standard of care and whether the misinformation or disinformation resulted in harm to patient health.*

3) To add a severability clause to protect the enforceability of the bill following any adverse ruling on the validity of a certain provision or application, insert a new Section 3 as follows:

*The provisions of this act are severable. If any provision of this act or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.*

4) To update statistics in the bill's findings and declarations, amend Section 1 to replace "5,000,000" with "6,000,000 and "75,000" with "90,000."

**REGISTERED SUPPORT:**

California Medical Association *(Sponsor)*
American Academy of Pediatrics, California
American College of Obstetricians and Gynecologists District IX
California Chapter of the American College of Emergency Physicians
California Podiatric Medical Association
California Rheumatology Alliance
California Society of Anesthesiologists
Children's Specialty Care Coalition
Families for Opening Carlsbad Schools
Numerous individuals

**REGISTERED OPPOSITION:**

A Voice for Choice Advocacy
California Health Coalition Advocacy
Californians for Good Governance
Catholic Families 4 Freedom CA
Central Coast Health Coalition
Children's Health Defense California Chapter
Concerned Women for America
Depression and Bipolar Support Alliance California
Educate. Advocate.
Frederick Douglass Foundation of California
Homewatch Caregivers of Huntington Beach
Nuremberg 2.0 LTD.
Pacific Justice Institute
Physicians for Informed Consent
Protection of the Educational Rights for Kids
Restore Childhood
Siskiyou Conservative Republicans
Stand Up Sacramento County
Numerous individuals

**Analysis Prepared by**:  Robert Sumner / B. & P. / (916) 319-3301

# EXHIBIT C

ASSEMBLY THIRD READING
AB 2098 (Low)
As Amended  April 20, 2022
Majority vote

## SUMMARY

Expressly provides that the dissemination of misinformation or disinformation related to
COVID-19 by physicians and surgeons constitutes unprofessional conduct.

**Major Provisions**

1) Provides that the dissemination or promotion of misinformation or disinformation related to
   COVID-19 by a physician and surgeon constitutes unprofessional conduct.

2) Includes false or misleading information regarding the nature and risks of the COVID-19
   virus, its prevention and treatment, and the development, safety, and effectiveness of
   COVID-19 vaccines as types of misinformation or disinformation that could be disseminated.

3) Requires the Medical Board of California (MBC) or Osteopathic Medical Board of California
   (OMBC) to consider both whether the licensee departed from the applicable standard of care
   and whether the misinformation or disinformation resulted in harm to patient health prior to
   bringing a disciplinary action against a licensee for disseminating misinformation or
   disinformation:

4) Defines "physician and surgeon" as a person licensed by either the MBC or the OMBC.

5) Defines "misinformation" as false information that is contradicted by contemporary scientific
   consensus to an extent where its dissemination constitutes gross negligence by the licensee.

6) Defines "disinformation" as misinformation that the licensee deliberately disseminated with
   malicious intent or an intent to mislead.

7) Defines "disseminate" as the conveyance of information from the licensee to a patient under
   the licensee's care in the form of treatment or advice.

8) Provides that violators of the bill's provisions are not guilty of a misdemeanor.

9) Makes various findings and declarations in support of this bill.

## COMMENTS

*COVID-19 Pandemic and Vaccines.*  To date, over 984,000 people have died of COVID-19 in
the United States, including approximately 90,000 Californians.  On March 4, 2020, Governor
Gavin Newsom proclaimed a State of Emergency as a result of the impacts of the COVID-19
public health crisis, and on March 19, 2020, the Governor formally issued a statewide "stay at
home order," directing Californians to only leave the house to provide or obtain specified
essential services.  Subsequent guidance from the State Public Health Officer expressly
exempted from that order various professionals regulated by the Department of Consumer
Affairs (DCA), including physicians and surgeons providing essential care.

On March 30, 2020, Governor Newsom announced an initiative to "expand California's health care workforce and recruit health care professionals to address the COVID-19 surge" and signed Executive Order N-39-20.  This executive order established a waiver request process under the DCA and included other provisions authorizing the waiver of licensing, certification, and credentialing requirements for health care providers.  Through this waiver process, the DCA issued a series of waivers of law to authorize various healing arts professionals to order and administer COVID-19 vaccines.  These waivers aligned with similar authority granted federally under the Public Readiness and Emergency Preparedness (PREP) Act for Medical Countermeasures Against COVID-19.

Vaccines are regulated and overseen by multiple federal entities responsible for ensuring their safety and efficacy.  The federal Food and Drug Administration (FDA) is initially responsible for approving new drugs, determining both that they are safe to administer and that their recommended use is clinically supported.  During states of emergency, the FDA may expedite their review through the Emergency Use Authorization (EUA) process to accelerate the availability of new immunizations or treatments.  Currently, three vaccines have been approved through the EUA process for COVID-19.  These vaccines have additionally been reviewed and found safe by national experts participating in a Western States Scientific Safety Review Workgroup.  Data has continued to show that the risks of infection, hospitalization, and death for vaccinated individuals are dramatically lower than for those who have not been vaccinated.

*Misinformation and Disinformation.*  This bill is intended to target three types of false or misleading information relating to the COVID-19 pandemic.  First, the language refers to nonfactual information regarding "the nature and risks of the virus"—for example, misleadingly comparing COVID-19 to less serious conditions or inaccurately characterizing the deadliness of the disease.  Second, the bill seeks to address false statements regarding its "prevention and treatment"—this would presumably include the promotion of treatments and therapies that have no proven effectiveness against the virus.  The third category is for misinformation or disinformation regarding "the development, safety, and effectiveness of COVID-19 vaccines."

Public skepticism and misunderstanding of diseases, treatments, and immunizations is not unique to COVID-19.  The earliest known group formed to oppose vaccination programs, the National Anti-Vaccination League, was established in the United Kingdom in 1866 following a series of violent protests against mandatory smallpox immunizations in the Vaccination Act of 1853.  In 1918, conspiracy theories were circulated that the Spanish Flu pandemic was a deliberate act of biological warfare, spread through aspirin manufactured by German company Bayer.

What has been historically unprecedented about the dissemination of misinformation and disinformation throughout the COVID-19 pandemic is the omnipresence of media coverage and the prevalence of social media.  False information can easily be spread to millions within days or even hours of it being created.  It can become challenging for a population already feeling overloaded with complex information to differentiate between thoroughly researched, accurate reporting and information that is oversimplified, unproven, or patently false.

A substantial factor in the spread of false information is a phenomenon known as "confirmation bias."  When individuals hold a preexisting belief or suspicion, they will often unconsciously seek out information to validate that predisposition and filter out contradictory evidence.  The persistence of modern media exposure and the internet has exacerbated this effect, as information seeming to support virtually any viewpoint or understanding can now easily be found through the

use of search engines and social media. Many websites further exacerbate the issue of confirmation bias by algorithmically delivering consistent information to users who have demonstrated a pattern of belief or ideology.

The role of physicians and other health professionals in legitimizing false information during the COVID-19 pandemic has presented serious implications for public safety. For example, the federal Centers for Disease Control and Prevention (CDC) has for decades been recognized as the United States government's primary agency for protecting Americans through expert research and advice related to the control and prevention of communicable disease. The CDC has consistently warned Americans about the threat of COVID-19 and strongly encouraged vaccination. However, throughout the pandemic, many individuals who are predisposed toward skepticism of the government and incredulity toward vaccines have sought to validate those views, despite unambiguous guidance to the contrary from leading health experts.

As a result, health practitioners whose views on COVID-19 and immunization against it are within the extreme minority for their profession are armed with a disproportionately loud voice in the public discourse. Antigovernment cynics and vaccine skeptics cohere to the opinions of those few physicians who will reinforce their beliefs as they seek to appeal to authority in service of their confirmation bias. The effect of this is that a relatively small group of public health contrarians who are licensed as physicians will be afforded the same, if not more, credibility as long-trusted public institutions like the CDC, the FDA, and the American Medical Association, even if those physicians do not specialize in epidemiology or infectious disease prevention.

The incongruity of this reasoning is frequently rationalized in part through conspiracy theories about the medical establishment. This is not novel. When allopathic medicine first achieved dominance during the Progressive Era, there were many who vilified the medical system as financially motivated, accusing "modern medicine men" of oppressing natural therapies in order to profit from a monopoly on health care practice. Other related conspiracy theories frequently involve the United States government, which has been accused of everything from inventing or exaggerating the pandemic to suppressing natural remedies, or even using COVID-19 vaccines as a clandestine method for implanting microchips into Americans.

*Role of State Medical Boards.* Physicians and surgeons in California are regulated by one of two entities: the Medical Board of California (MBC) or the Osteopathic Medical Board of California (OMBC). The MBC licenses and regulates about 153,000 physicians while the OMBC licenses and regulates slightly over 12,000. Despite receiving different forms of medical education and being overseen by separate boards, the essential scope of practice for these two categories of licensees are virtually identical.

In July of 2021, the Federation of State Medical Boards (FSMB) issued a statement positioned as being "in response to a dramatic increase in the dissemination of COVID-19 vaccine misinformation and disinformation by physicians and other health care professionals on social media platforms, online and in the media." The FSMB warned that physicians who engage in the spread of false information related to COVID-19 were jeopardizing their licenses to practice medicine. While physicians are subject to discipline only by boards located in states where they hold a license, the FSMB's statement was viewed as a serious warning to doctors that they risked disciplinary action if they engaged in spreading inaccurate information.

Following the FSMB's statement, some state medical boards appeared poised to take action against licensees found to be spreading misinformation or disinformation. Tennessee's Board of

Medical Examiners adopted the FSMB's statement as their own. However, in response, the state's Republican legislature threatened to disband the board if it sought to take any such action against a physician. Legislation in at least fourteen states has been introduced to prevent medical boards from holding physicians who spread false information accountable in accordance with the FSMB's guidance.

In contrast to legislative action taken in those states, this bill would seek to confirm that in California, physicians who disseminate COVID-19 misinformation or disinformation are indeed subject to formal discipline. The bill would expressly establish that such dissemination would constitute "unprofessional conduct"—a term used prolifically in the Medical Practice Act as a general description of numerous forms of conduct for which disciplinary action may be taken. The MBC or OMBC would be required to consider multiple factors prior to filing an accusation, but would ultimately be authorized to take enforcement action against physicians who have used their licenses to jeopardize public health and safety through the spread of false information.

It is certainly meaningful that this bill would establish as a matter of California law that physicians are subject to discipline for spreading false information. However, it is more than likely that the MBC and OMBC are both already fully capable of bringing an accusation against a physician for this type of misconduct. For example, the Medical Practice Act includes "gross negligence" and "repeated negligent acts" within the meaning of unprofessional conduct, representing situations where the physician deviated from the standard of care in the opinion of the MBC and its expert medical reviewers.

If, for example, a physician were to advise patients to inject disinfectant as a way of treating COVID-19 – as former President Trump once did, resulting in a sharp rise in reported incidents of misusing bleach and other cleaning products – disseminating that "misinformation" would almost certainly be considered negligent care subject to discipline. Whether a case of spreading misinformation is sufficient to bring an action for gross negligence would be evaluated using the MBC's expert reviewer guidelines, which provide that "the determining factor is the *degree* of departure from the applicable standard of care." Similarly, it is arguable that spreading "disinformation" as commonly defined would constitute an "act of dishonesty or corruption"— also statutorily included within the Medical Practice Act's meaning of unprofessional conduct.

Those in opposition to this bill have expressed concern that the MBC would overzealously prosecute doctors for expressing views that are outside the mainstream but not indisputably unreasonable based on the physician's research and training. This apprehension cannot easily be reconciled with persistent criticisms levied against the MBC by the Legislature and patient safety advocates, who have repeatedly reproved the board for its underwhelming enforcement activities. Major news editorials have pointed out that the MBC only takes formal disciplinary action in about three percent of cases, and that more than 80 percent of complaints are dismissed without investigation. As the Legislature persists in its admonishment of the MBC for failing to take aggressive action against physicians who commit unprofessional conduct, it would appear dubious that the board would excessively utilize the authority expressly provided by this bill.

It stands to reason that Californians who have demonstrated suspicion toward both the medical establishment and their government would be slow to trust the MBC, with a majority of its members consisting of physicians appointed by the Governor. However, the degree of enmity recently exhibited by physicians and others opposed to COVID-19 prevention policies could be viewed as disturbing. In December of 2021, it was reported that representatives of an anti-

vaccination organization called America's Frontline Doctors had stalked and intimidated Kristina Lawson, President of the MBC.  This harassment was escalated in April of 2022 when that same organization "released a 21-minute video that depicts Lawson in Nazi regalia, a whip in her hand and swastika on her shoulder, and shows a clip of the garage confrontation validating Lawson's description."

America's Frontline Doctors was founded by Dr. Simone Gold, who holds an active license in California as a physician.  Dr. Gold and her organization have vociferously promoted hydroxychloroquine as a COVID-19 treatment, despite evidence increasingly showing it to be ineffective and potentially unsafe.  Dr. Gold has engaged in multiple campaigns to stoke public distrust in COVID-19 vaccines, characterizing them as "experimental" despite numerous safety and efficacy trials successfully confirming their safety and efficacy.  Dr. Gold spoke at a rally held in conjunction with the attempted insurrection on the United States Capitol on January 6, 2021; she was arrested and subsequently pleaded guilty to a misdemeanor relating to that event.

Despite what would appear to be repeated conduct perpetrated by Dr. Gold involving the dissemination of false information regarding COVID-19, Dr. Gold's license remains active with the MBC and there appears to be no record of any disciplinary action taken against her.  Given the air of legitimacy she sustains from her status as a licensed physician, Dr. Gold likely serves as an illustrative example of the type of behavior that the author of this bill seeks to unequivocally establish as constituting unprofessional conduct for physicians in California.  Regardless of whether similar authority is already available to the MBC through other enforceable provisions in the Medical Practice Act, it is understandable that the author desires to make this authority explicit and confirm that doctors licensed in California who disseminate misinformation or disinformation should be held fully accountable.

**According to the Author**
"AB 2098 is crucial to addressing the amplification of misinformation and disinformation related to the COVID-19 pandemic. Licensed physicians, doctors, and surgeons possess a high degree of public trust and therefore must be held accountable for the information they spread. Providing patients with accurate, science-based information on the pandemic and COVID-19 vaccinations is imperative to protecting public health. By passing this legislation, California will show its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

**Arguments in Support**
The *California Medical Association* (CMA) is co-sponsoring this bill.  According to the CMA: "The COVID-19 pandemic has unfortunately led to increasing amounts of misinformation and disinformation related to the disease including how the virus is transmitted, promoting untested treatments and cures, and calling into question public health efforts such as masking and vaccinations. Many health professionals, including physicians, have been the culprits of this misinformation and disinformation effort."

*ProtectUS* is co-sponsoring this bill, writing: "Licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. They have a professional and ethical obligation to counsel and treat patients based not on their own opinion or beliefs, but on medical guidelines and peer-reviewed scientific evidence. When they choose to spread inaccurate information and lend credibility to conspiracy theories, physicians discourage patients from accessing life-saving vaccines. And their actions disproportionately affect the most

vulnerable members of society – those who have the least access to credible information, and the fewest resources available should they become sick."

**Arguments in Opposition**

*A Voice for Choice Advocacy* opposes this bill, writing: "While we agree that physicians and surgeons should be disciplined for maliciously sharing misinformation and disinformation, there are already measures in place for the California Medical Board to discipline for such offenses. Furthermore, AB 2098 is overly broad and would be impossible to implement because there is no definition and no established 'standard of care' or 'contemporary scientific consensus' for treating SARS-COV-2/COVID-19."

*Californians for Good Governance* opposes this bill "based on concerns about its unconstitutional restrictions on free speech."  The organization argues that "while the state may be able to claim that providing the public with accurate information regarding Covid-19 is a compelling interest, it cannot possibly argue that the blunt weapon that AB 2098 represents is narrowly tailored to that interest."  The organization further states that "in a country such as ours, which was established on the foundation of civil liberties such as free speech, the truth is something hashed out in the marketplace of ideas, rather than dictated by the government."

## FISCAL COMMENTS

According to the Assembly Appropriations Committee, no costs to the MBC, which currently implements an allegation code for COVID-19-related complaints and tracks discipline related to unprofessional conduct, meeting the requirements of this bill; and minor and absorbable costs to the OMBC.

## VOTES

**ASM BUSINESS AND PROFESSIONS:  12-5-2**
**YES:**  Berman, Bloom, Mia Bonta, Gipson, Irwin, Lee, McCarty, Medina, Mullin, Ward, Ting, Akilah Weber
**NO:**  Flora, Chen, Cunningham, Megan Dahle, Fong
**ABS, ABST OR NV:**  Grayson, Arambula

**ASM APPROPRIATIONS:  12-4-0**
**YES:**  Holden, Bryan, Calderon, Carrillo, Mike Fong, Gabriel, Eduardo Garcia, Jones-Sawyer, Quirk, Robert Rivas, Akilah Weber, Wilson
**NO:**  Bigelow, Megan Dahle, Davies, Fong

## UPDATED

VERSION: April 20, 2022

CONSULTANT:  Robert Sumner / B. & P. / (916) 319-3301                  FN: 0002384

# EXHIBIT D

# SENATE COMMITTEE ON
# BUSINESS, PROFESSIONS AND ECONOMIC DEVELOPMENT
## Senator Richard Roth, Chair
## 2021 - 2022  Regular

| | | | |
|---|---|---|---|
| **Bill No:** | AB 2098 | **Hearing Date:** | June 27, 2022 |
| **Author:** | Low | | |
| **Version:** | June 21, 2022 | | |
| **Urgency:** | No | **Fiscal:** | Yes |
| **Consultant:** | Sarah Mason | | |

**Subject:**  Physicians and surgeons: unprofessional conduct

**SUMMARY:**  Makes disseminating misinformation, as defined, or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines, by a physician and surgeon unprofessional conduct.

**Existing law:**

1) Establishes various practice acts in the Business and Professions Code (BPC) governed by various boards within the Department of Consumer Affairs (DCA) which provide for the licensing and regulation of health care professionals.  (Business and Professions Code (BPC) §§ 500 *et seq.*)

2) Regulates the practice of medicine under the Medical Practice Act (Act), which establishes the Medical Board of California (MBC) to administer and enforce the Act. (Business and Professions Code (BPC) § 2000 *et. seq.*)

3) Enacts the Osteopathic Act, which provides for the licensure and regulation of osteopathic physicians and surgeons. (BPC §§ 2450 et seq.)

4) Provides that protection of the public shall be the highest priority for both the MBC and the Osteopathic Medical Board of California (OMBC) in exercising their respective licensing, regulatory, and disciplinary functions, and that whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount. (BPC § 2001.1; § 2450.1)

5) Provides that all proceedings against a licensee for unprofessional conduct, or against an applicant for licensure for unprofessional conduct or cause, shall be conducted in accordance with the Administrative Procedure Act. (BPC § 2230)

6) Establishes various violations that constitute unprofessional conduct. (BPC §§ 725 *et. seq)*

7) Requires the MBC to take action against any licensee who is charged with unprofessional conduct, which includes, but is not limited to, the following:

   a) Violating or aiding in the violation of the Medical Practice Act.

b) Gross negligence.

c) Repeated negligent acts.

d) Incompetence.

e) The commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician.

f) Any action or conduct that would have warranted the denial of a certificate.

g) The failure by a physician, in the absence of good cause, to attend and participate in an investigatory interview by the MBC. (BPC § 2234)

8) Provides that a physician shall not be subject to discipline solely on the basis that the treatment or advice they rendered to a patient is alternative or complementary medicine if that treatment or advice was provided after informed consent and a good-faith prior examination; was provided after the physician provided the patient with information concerning conventional treatment; and the alternative complementary medicine did not cause a delay in, or discourage traditional diagnosis of, a condition of the patient, or cause death or serious bodily injury to the patient. (BPC § 2234.1)

**This bill**:

1) Provides that it is unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including:

a) False or misleading information about the nature and risks of the virus,

b) COVID-19 prevention and treatment; and

c) The development, safety, and effectiveness of COVID-19 vaccines.

2) Defines the following for the purposes of 1) and 2):

a) "Board" means the MBC or OMBC.

b) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.

c) "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.

d) "Misinformation" means false information that is contradicted by contemporary scientific consensus to an extent where its dissemination constitutes gross negligence by the licensee.

e) "Physician and surgeon" means person licensed by the MBC or OMBC.

3)   Specifies that violators of these provisions are not guilty of a misdemeanor.

4)   Makes findings and declarations that:

   a)   The global spread of the SARS-CoV-2 coronavirus, or COVID-19, has claimed the lives of over 6,000,000 people worldwide, including nearly 90,000 Californians.

   b)   Data from the federal Centers for Disease Control and Prevention (CDC) shows that unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated.

   c)   The safety and efficacy of COVID-19 vaccines have been confirmed through evaluation by the federal Food and Drug Administration (FDA) and the vaccines continue to undergo intensive safety monitoring by the CDC.

   d)   The spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence and placed lives at serious risk.

   e)   Major news outlets have reported that some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals.

   f)   The Federation of State Medical Boards has released a statement warning that physicians who engage in the dissemination of COVID-19 vaccine misinformation or disinformation risk losing their medical license, and that physicians have a duty to provide their patients with accurate, science-based information.

   g)   In House Resolution No. 74 of the 2021–22 Regular Session, the California State Assembly declared health misinformation to be a public health crisis, and urged the State of California to commit to appropriately combating health misinformation and curbing the spread of falsehoods that threaten the health and safety of Californians.

**FISCAL EFFECT:**  According to the Assembly Committee on Appropriations, the bill will not result in costs to MBC, which currently implements an allegation code for COVID-19-related complaints and tracks discipline related to unprofessional conduct, meeting the requirements of this bill. The Committee noted that the bill will result in minor and absorbable costs to OMBC.

**COMMENTS:**

1.   **Purpose.**  The bill is sponsored by the <u>California Medical Association</u>. According to the Author, "AB 2098 is crucial to addressing the amplification of misinformation and disinformation related to the COVID-19 pandemic. Licensed physicians, doctors, and surgeons possess a high degree of public trust and therefore must be held accountable for the information they spread.

   Providing patients with accurate, science-based information on the pandemic and COVID-19 vaccinations is imperative to protecting public health. By passing this

legislation, California will demonstrate its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

2. **Background.**

*COVID-19 Misinformation and Disinformation.* In March 2020, Governor Newsom declared a State of Emergency due to the COVID-19 pandemic that was beginning to spread widely. Center for Disease Control (CDC) and State Public Health Officials began issuing regular updates to inform the state on the long and short impacts of the virus, best ways to prevent spreading and contracting the virus which include wearing surgical and N-95 masks and receiving the COVID-19 vaccine, and awareness of symptoms. As the CDC and State Public Health officials began to learn more about the virus, spread, and overall impacts, the information was disseminated to doctors to help patients survive the virus if contracted, prevent patients from getting the virus, and cope with long term side effects now known as "long COVID". During the course of the pandemic, all healthcare professionals spent countless days treating patients and learning about the virus.

In December 2020, an emergency-approved COVID-19 vaccine began to roll out first to the aging population and healthcare professionals and eventually to all adults, and now all children. While scientists began working on creating the vaccine, misinformation and disinformation spread widely. CDC makes the distinction that misinformation is shared by people who not intend harm and disinformation is false information to deliberately disseminate with malice. This bill makes a distinction, but does not differentiate consequences for doctors.

Misinformation has resulted in less than desired vaccine rates, continued unnecessary spread and risk to communities. As of June 21, 2022, only 75.6% of people 5 and older are fully vaccinated[1]. Yale Medicine reports that a community needs 95% of the population to reach herd immunity. Part of the low vaccine rate is attributed to misinformation causing fear about potential side effects. Vaccine hesitancy is directly linked to misinformation.[2] Researchers at the Center for Health Security at the Johns Hopkins Bloomberg School of Public Health recently estimated that 2 million to 12 million people in the US were unvaccinated against COVID-19 because of misinformation or disinformation.

In November 21, the American Medical Association adopted a new policy to combat misinformation because "[health professional] using their professional license to validate the disinformation they are spreading has seriously undermined public health efforts"[3] The CDC and State Public Health Officials have published a myths and facts page to clarify misinformation. Myths the CDC is actively informing Americans about include: vaccines do not contain microchips, the vaccine will not make you magnetic, and the vaccine will not change your DNA.  Origination of misinformation is not clear; however, the White House reported in 2021 that much

---

[1] https://covid19.ca.gov/vaccination-progress-data/#overview
[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8528483/
[3] https://www.ama-assn.org/press-center/press-releases/ama-adopts-policy-combat-disinformation-health-care-professionals

of the COVID-19 vaccine misinformation began with a number of online social media users.

The CDC and State Public Health Officials are generally recognized as the leading experts in issue guidance for all public health matters which in the recent past has included sharing information on heart disease, diabetes, and communicable diseases. However, the CDC and public health officials' knowledge and public trust has been questioned. In peer-reviewed journal, a study determined that "prophylaxis of COVID-19 misinformation might be achieved by taking concrete steps to improve trust in science and scientists, such as building understanding of the scientific process and supporting open science initiatives."[4] Doctors providing accurate information would serve as an imperative piece of this recommendation to combat current misinformation.

In Florida, a doctor filed a complaint the Florida Department of Health allegedly a doctor was spreading misinformation about the safety and effectiveness of the COVID-19 vaccine and the use of masks for prevention. Ultimately there was no action taken against the doctor accused of spreading misinformation because state law does not prohibit misinformation or disinformation from doctors.[5] Other reports of physicians providing false information remains an issue.

Physicians and healthcare professionals play a critical role in keeping communities healthy. A physician's recommendation and information sharing will educate and inform decisions made by their patients. As such, providing accurate information will ultimately impact patient's health. NPR reported that, "The Center for Countering Digital Hate, which tracks vaccine misinformation online, says that even though the number of doctors involved in spreading this sort of bad information is tiny, they're having an outsized influence."[6] This bill would explicating hold physicians accountable for providing misinformation or disinformation about COVID-19 vaccines. This bill does not, however, include other healthcare professionals which have also been reported as spreading misinformation and disinformation.

*Physician and surgeon enforcement.* The enforcement process begins with a complaint. Complaints are received from various sources, including the public, generated internally by MBC or OMBC, or based on information MBC and OMBC receive from various entities through mandatory reports to the boards.

MBC licensee complaints are received by the Central Complaint Unit, which starts the process of determining next steps for a complaint. All complaints that pertain to treatment provided by a physician require patient medical records to be obtained. MBC reports that it is "subject to significant limitations in its authority to inspect and review medical records in the possession of a licensee. Generally, the Board must obtain patient consent prior to requesting records from a licensee. However, obtaining patient consent (for example, in cases involving inappropriate prescribing of opioids) may be difficult. If the patient refuses to give consent, then the Board

---

[4] https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-020-10103-x
[5] https://jamanetwork.com/journals/jama/fullarticle/2789369
[6] https://www.npr.org/sections/health-shots/2021/09/14/1035915598/doctors-covid-misinformation-medical-license

must establish good cause to issue a subpoena and may have to file a motion to compel in superior court to enforce the subpoena. Without quick access to records, investigations take longer to complete. In some cases, the Board is required to close complaints because its investigation cannot proceed without relevant medical records." Complaints regarding quality of care are received and reviewed by OMBC's Complaint Unit (CU) in Sacramento by a medical consultant. The CU medical consultant determines whether the quality of care issues presented in the complaint and supporting documents warrant investigation.

Pursuant to Business and Professions Code (BPC) Section 2220.08, before a quality of care complaint for MBC licensees is referred for further investigation, it must be reviewed by one or more medical experts with the pertinent education, training, and expertise to evaluate the specific standards of care issues raised by the complaint to determine if further field investigation is required.  When a medical reviewer determines that a complaint warrants referral for further investigation, CCU transfers the complaint to the Health Quality Investigation Unit (HQIU) in the DCA's Division of Investigation (DOI) which handles investigations for a number of health related boards within DCA to be investigated by a sworn investigator, a peace officer. There are 12 HQIU field offices located throughout California that handle these investigations.

MBC's complaint priorities are outlined in BPC section 2220.05 in order to ensure that physicians representing the greatest threat of harm are identified and disciplined expeditiously. MBC must ensure that it is following this section of law when investigating complaints, including complaints alleging the following as being the highest priority:

- Gross negligence, incompetence, or repeated negligent acts that involve death or serious bodily injury to one or more patients, such that the physician and surgeon represents a danger to the public

- Drug or alcohol abuse by a physician and surgeon involving death or serious bodily injury to a patient

- Repeated acts of clearly excessive prescribing, furnishing, or administering of controlled substances, or repeated acts of prescribing, dispensing, or furnishing of controlled substances without a good faith prior examination of the patient and medical reason therefor

- Repeated acts of clearly excessive recommending of cannabis to patients for medical purposes, or repeated acts of recommending cannabis to patients for medical purposes without a good faith prior examination of the patient and a medical reason for the recommendation

- Sexual misconduct with one or more patients during a course of treatment or an examination,

- Practicing medicine while under the influence of drugs or alcohol; and

- Repeated acts of clearly excessive prescribing, furnishing, or administering psychotropic medications to a minor without a good faith prior examination of the patient and medical reason therefor.

For complaints about physicians and surgeons that are subsequently investigated and meet the necessary legal prerequisites, a Deputy Attorney General (DAG) in the Office of the Attorney General (OAG) drafts formal charges, known as an "Accusation". A hearing before an Administrative Law Judge (ALJ) is subsequently scheduled, at which point settlement negotiations take place between the DAG, the physician and their attorney and MBC or OMBC staff.  Often times these result in a stipulated settlement, similar to a plea bargain in criminal court, where a licensee admits to having violated charges set forth in the accusation, or admits that the MBC or OMBC could establish a factual and legal basis for the charges in the Accusation at hearing, and accepts penalties for those violations.  If a licensee contests charges, the case is heard before an ALJ who subsequently drafts a proposed decision.  This decision is reviewed by a panel of MBC members or the OMBC Board who either adopt the decision as proposed, adopt the decision with a reduced penalty or adopt the decision with an increased penalty.  If probation is ordered, a copy of the final decision is referred to MBC's Probation Unit or OMBC's probation monitor for assignment to an inspector who monitors the licensees for compliance with the terms of probation.

3. **Arguments in Support.**  According to The <u>American College of Obstetricians and Gynecologists District IX (ACOG)</u>, "In response to the surge of misinformation, AB 2098 will constitute unprofessional conduct for a physician and surgeon to spread disinformation related to COVID-19, including false or misleading information regarding the virus, its prevention and treatment; and development, safety, and effectiveness of COVID-19 vaccines.

Licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. When they choose to spread inaccurate information, physicians contradict their responsibilities and further erode public trust in the medical profession. By passing this bill, California will demonstrate its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

The <u>California Medical Association</u> writes, "The COVID-19 pandemic has unfortunately led to increasing amounts of misinformation and disinformation related to the disease including how the virus is transmitted, promoting untested treatments and cures, and calling into question public health efforts such as masking and vaccinations. Many health professionals, including physicians, have been the culprits of this misinformation and disinformation effort.

In July, the Federation of State Medical Boards (FSMB) released a statement1 in response to the dramatic increase in COVID-19 misinformation and disinformation. The FSMB stated, "physicians who generate and spread COVID-19 vaccine misinformation or disinformation are risking disciplinary actions by state medical boards, including the suspension and revocation of their medical licenses … they also have an ethical and professional responsibility to practice medicine in the best interests of their patients and must share information that is factual, scientifically grounded and consensus-driven for the betterment of public health. Spreading

inaccurate COVID-19 vaccine information contradicts that responsibility, threatens to further erode public trust in the medical profession, and puts all patients at risk."

While the MBC may have the ability to discipline licensees for unprofessional conduct under Business and Professions Code section 2234, AB 2098 makes clear that the MBC has the statutory authority to take such actions against physicians that spread COVID-19 misinformation or disinformation."

The County Health Executives Association of California (CHEAC) writes, "The United States Surgeon General Dr. Vivek H. Murthy recently stated "Health misinformation is a serious threat to public health. It can cause confusion, sow mistrust, harm people's health, and undermine public health efforts." Unfortunately, throughout the COVID-19 pandemic, we have witnessed a small minority of medical professionals spread misinformation and disinformation that has led some Californians to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments, such as ivermectin. The American Board of Medical Specialties (ABMS), consisting of the boards that determine whether physicians can be board-certified, issued a statement in September 2021 stating, "The spread of misinformation and the misapplication of medical science by physicians and other medical professionals is especially harmful as it threatens the health and wellbeing of our communities and at the same time undermines public trust in the profession and established best practices in care." Further, a recent article in the Journal of the American Medical Association states that the power of social media amplifies the message of the small minority of physicians making these types of false claims. AB 2098 clarifies in statute that the dissemination of COVID-19 misinformation and disinformation is unprofessional conduct and would give clear direction to the Medical Board of California and the Osteopathic Medical Board of California on how to evaluate a potential disciplinary action against a physician or surgeon who may be investigated for this reason."

According to the American Academy of Pediatrics, California, "Licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. When they choose to spread inaccurate information, physicians contradict their responsibilities and further erode public trust in the medical profession. By passing this bill, California will demonstrate its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

4.  **Arguments in Opposition.**  According to a Voice for Choice Advocacy, "While we agree that physicians and surgeons should be disciplined for maliciously sharing misinformation and disinformation, there are already measures in place for the California Medical Board to discipline for such offenses. Furthermore, AB 2098 is overly broad and would be impossible to implement because there is no definition and no established "standard of care" or "contemporary scientific consensus" for treating SARS-COV-2/COVID-19.

We are still in a time of evolution with this virus and its treatment, as we have been for the past 2+ years. SARS-COV-2 has mutated becoming more transmissible but less severe. While a handful of treatments have been authorized by the FDA, such as monoclonal antibodies and anti-viral medications, there are hundreds more in clinical trials that will come to market in the next months and years.

In the meantime, if this bill passes, California risks losing even more doctors to other states because they do not want to be put in the position of possibly being disciplined because they were using the latest research, which had not become standard of care yet, or trying adjunct treatments for better outcomes, that may not have been discovered or written about yet, or using protocols from other countries or states. If it were not for doctors trying different approaches throughout the past two years, we would still be using ventilators ineffectively."

Association of American Physicians and Surgeons, Inc. write, "We believe it is unethical for physicians to participate in any process that impedes the free exchange of scientific and clinical ideas through public allegations of misconduct or threats of punishment. Use of the stigmatizing label "misinformation" in a medical disciplinary environment is anti-scientific and unethical. *To our colleagues:* In addressing differences of opinion regarding patient management, we call on all physicians to abstain from making public allegations of professional misconduct against colleagues. *To Medical Board Members*: Decisions on sanctions against individual physicians exert the gravest of influence, reaching into life and- death clinical decision-making. AAPS believes the proper role for a medical practice board is to provide a legal mechanism for patients and physicians to investigate and resolve allegations of professional misconduct. This can only be accomplished in an environment with clearly defined rules, access to full legal due process, and scientific integrity. It is ethically improper to use disciplinary boards to resolve debates about the interpretation of medical science."

According to California Health Coalition Advocacy, "CHCA has the following concerns about this bill:

- Doctors go through rigorous education and training and should be allowed to voice their medical and professional opinions freely.
- Science and medicine have historically been advanced through minority voices. The stifling of dissenting opinion will have long lasting effects on the advancement of health care.
- The unintended consequence might be that the healthcare provider shortage would be exacerbated by the proposed law.
- California Business and Professions code recognizes that: "Since the National Institute of Medicine has reported that it can take up to 17 years for a new best practice to reach the average physician and surgeon, it is prudent to give attention to new developments not only in general medical care, but in the actual treatment of specific diseases, particularly those that are not yet broadly recognized in California." Division 2, Chapter 5, Article 12, Section 2234.1
- The understanding of the data and science related to COVID-19 continues to change as more studies are done. Standards of care are being updated as new information and treatments emerge. Any attempt at determining "contemporary scientific consensus" will be fleeting.
- Top doctors in their field from UCSF, Stanford, and other well respected institutions are speaking out about their lack of support for COVID-19 vaccines for children. Would these respected doctors be disciplined if AB 2098 were to pass?"

Californians for Good Governance opposes this bill "based on concerns about its unconstitutional restrictions on free speech." The organization argues that "while the state may be able to claim that providing the public with accurate information regarding Covid-19 is a compelling interest, it cannot possibly argue that the blunt weapon that AB 2098 represents is narrowly tailored to that interest." The organization further states that "in a country such as ours, which was established on the foundation of civil liberties such as free speech, the truth is something hashed out in the marketplace of ideas, rather than dictated by the government."

5.  **Comments.** MBC supports this bill if it is amended. According to MBC, it "faces considerable challenges investigating cases involving a violation of the [Act] related to COVID-19. Oftentimes, complaints received by the Board pertaining to COVID-19 are made by a member of the public and not the patient of the physician. In some COVID-19 related investigations, the Board is unable to identify any specific patients who have been treated by the physician in question. Without a patient's name, it is impossible to obtain their consent for records and the Board will be unable to identify what patient records to seek in an investigative subpoena."

    MBC notes that its request for enhanced authority to inspect medical records would assist in overcoming this challenge.  MBC also states that "The definition of 'misinformation' is unclear and may lead to legal challenges following the imposition of discipline under this proposed law. If this occurs, the Board will have to use its financial resources, its staff time, and the staff time of the Attorney General's Office to defend against such litigation. Further, the Board may face significant challenges proving the dissemination of "disinformation," as it would be required to establish the physician's intent. Under current law, to prove a violation of the standard of care, the intent of the licensee, generally, is not relevant. MBC requests that the definition be updated to read

    > "Misinformation" means false information that is contradicted by contemporary scientific consensus ***contrary to the standard of care*** ~~to an extent where its dissemination constitutes gross negligence by the licensee~~.

    According to MBC, "This amendment connects the potential violation to the standard of care, which is a well-established concept followed by the Board and related administrative entities involved in the disciplinary process."

6.  **Should this bill only apply to physicians and surgeons?** Physician and surgeons are not the only licensed health care providers licensed who may engage in practices that this bill seeks to address.  Earlier this year, this Committee, in coordination with the Assembly Committee on Business and Professions, asked questions through the sunset review oversight process about efforts health care licensing programs are undertaking in order to curb the spread of medical misinformation. One example was highlighted in a staff prepared background paper for the sunset review oversight of the Board of Chiropractic Examiners noting that in Spring 2020, that board reported that several complaints were received about licensed doctors of chiropractic who were advertising that chiropractic care can help patients reduce their risk of COVID-19 infection. That board investigated the complaints, and the licensees subsequently removed advertisements from their

websites. Given that many additional licensed health care providers also have a "high degree of public trust and therefore must be held accountable for the information they spread", as the Author notes for physicians and surgeons in identifying the rationale for this measure, it is unclear why only one category of professional would be specified through statue designating their activities as unprofessional conduct. *The Author may wish to continue discussing whether other health care licensees should be included in the provisions of this bill.*

**SUPPORT AND OPPOSITION:**

Support:

California Medical Association (Sponsor)
American Academy of Pediatrics, California
American College of Obstetricians and Gynecologists District IX
California Chapter of The American College of Emergency Physicians
California Podiatric Medical Association
California Rheumatology Alliance
California Society of Anesthesiologists
Children's Specialty Care Coalition
County Health Executives Association of California
Families for Opening Carlsbad Schools
Pandemic Patients
Protect US
Teens for Vaccines INC.

Opposition:

A Voice for Choice Advocacy
Association of American Physicians and Surgeons
California Health Coalition Advocacy
Californians for Good Governance
Catholic Families 4 Freedom CA
Central Coast Health Coalition
Children's Health Defense California Chapter
Coalition for Informed Consent
Concerned Women for America
Dbsa California
Educate. Advocate.
Family Details LLC
Frederick Douglass Foundation of California
Freedom Keepers United, CA Freedom Keepers
Front Line Covid-19 Critical Care Alliance
Homewatch Caregivers of Huntington Beach
Natomas USD for Freedom
Not On Our Watch
Nuremberg 2.0 Ltd.
Pacific Justice Institute
Physicians for Informed Consent
Protection of The Educational Rights for Kids

Real Impact.
Restore Childhood
Siskiyou Conservative Republicans
Stand Up Sacramento County
Towards an Internet of Living Beings
Whittier Parents for Choice


**-- END --**

# EXHIBIT E

**SENATE RULES COMMITTEE**                                        AB 2098
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

### THIRD READING

---

Bill No:    AB 2098
Author:     Low (D), et al.
Amended:    6/21/22 in Senate
Vote:       21

---

SENATE BUS., PROF. & ECON. DEV. COMMITTEE:  9-4, 6/27/22
AYES:  Roth, Archuleta, Dodd, Eggman, Hurtado, Leyva, Min, Newman, Pan
NOES:  Melendez, Bates, Jones, Ochoa Bogh
NO VOTE RECORDED:  Becker

SENATE APPROPRIATIONS COMMITTEE:  5-2, 8/11/22
AYES:  Portantino, Bradford, Laird, McGuire, Wieckowski
NOES:  Bates, Jones

ASSEMBLY FLOOR:  53-20, 5/26/22 - See last page for vote

---

**SUBJECT:**  Physicians and surgeons:  unprofessional conduct

**SOURCE:**  California Medical Association

---

**DIGEST:**  This bill makes disseminating misinformation, as defined, or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines, by a physician and surgeon unprofessional conduct.

**ANALYSIS:**

Existing law:

1)  Regulates the practice of medicine under the Medical Practice Act (Act), which establishes the Medical Board of California (MBC) to administer and enforce the Act. (Business and Professions Code (BPC) § 2000 *et. seq.*)

2)  Enacts the Osteopathic Act, which provides for the licensure and regulation of osteopathic physicians and surgeons. (BPC §§ 2450 et seq.)

3) Provides that protection of the public shall be the highest priority for both the MBC and the Osteopathic Medical Board of California (OMBC) in exercising their respective licensing, regulatory, and disciplinary functions, and that whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount. (BPC § 2001.1; § 2450.1)

4) Provides that all proceedings against a licensee for unprofessional conduct, or against an applicant for licensure for unprofessional conduct or cause, shall be conducted in accordance with the Administrative Procedure Act. (BPC § 2230)

5) Establishes various violations that constitute unprofessional conduct. (BPC §§ 725 *et. seq)*

6) Requires the MBC to take action against any licensee who is charged with unprofessional conduct, which includes, but is not limited to, the following:
   a) Violating or aiding in the violation of the Medical Practice Act.
   b) Gross negligence.
   c) Repeated negligent acts.
   d) Incompetence.
   e) The commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician.
   f) Any action or conduct that would have warranted the denial of a certificate.
   g) The failure by a physician, in the absence of good cause, to attend and participate in an investigatory interview by the MBC. (BPC § 2234)

7) Provides that a physician shall not be subject to discipline solely on the basis that the treatment or advice they rendered to a patient is alternative or complementary medicine if that treatment or advice was provided after informed consent and a good-faith prior examination; was provided after the physician provided the patient with information concerning conventional treatment; and the alternative complementary medicine did not cause a delay in, or discourage traditional diagnosis of, a condition of the patient, or cause death or serious bodily injury to the patient. (BPC § 2234.1)

This bill:

1) Provides that it is unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including: false or misleading information about the nature and risks of the virus; COVID-19 prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.

2) Defines the following:
   a)  "Board" means the MBC or OMBC.
   b) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.
   c)  "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.
   d) "Misinformation" means false information that is contradicted by contemporary scientific consensus to an extent where its dissemination constitutes gross negligence by the licensee.
   e) "Physician and surgeon" means person licensed by the MBC or OMBC.

3) Specifies that violators of these provisions are not guilty of a misdemeanor.

4) Makes findings and declarations about the impacts of COVID-19, information about COVID-19 vaccines, and impacts of misinformation and disinformation about COVID-19 vaccines

**Background**

*COVID-19 Misinformation and Disinformation.* In March 2020, Governor Newsom declared a State of Emergency due to the COVID-19 pandemic that was beginning to spread widely. In December 2020, an emergency-approved COVID-19 vaccine began to roll out first to the aging population and healthcare professionals and eventually to all adults, and now all children. While scientists began working on creating the vaccine, misinformation and disinformation spread widely. CDC makes the distinction that misinformation is shared by people who not intend harm and disinformation is false information to deliberately disseminate with malice. This bill makes a distinction, but does not differentiate consequences for doctors.

Misinformation has resulted in less than desired vaccine rates, continued unnecessary spread and risk to communities. Reports show that as of June 21, 2022, only 75.6% of people 5 and older are fully vaccinated. Yale Medicine reports that a community needs 95% of the population to reach herd immunity. Part of the low vaccine rate is attributed to misinformation causing fear about potential side effects. Researchers at the Center for Health Security at the Johns Hopkins Bloomberg School of Public Health recently estimated that 2 million to 12 million people in the US were unvaccinated against COVID-19 because of misinformation or disinformation.

In November 2021, the American Medical Association adopted a new policy to combat misinformation because "[health professional] using their professional

license to validate the disinformation they are spreading has seriously undermined public health efforts". The CDC and State Public Health Officials have published a myths and facts page to clarify misinformation. Origination of misinformation is not clear; however, the White House reported in 2021 that much of the COVID-19 vaccine misinformation began with a number of online social media users.

Physicians and healthcare professionals play a critical role in keeping communities healthy. A physician's recommendation and information sharing will educate and inform decisions made by their patients. As such, providing accurate information will ultimately impact patient's health. NPR reported that, "The Center for Countering Digital Hate, which tracks vaccine misinformation online, says that even though the number of doctors involved in spreading this sort of bad information is tiny, they're having an outsized influence." This bill would explicating hold physicians accountable for providing misinformation or disinformation about COVID-19 vaccines. This bill does not, however, include other healthcare professionals which have also been reported as spreading misinformation and disinformation.

**Comments**

According to MBC, it "faces considerable challenges investigating cases involving a violation of the [Act] related to COVID-19. Oftentimes, complaints received by the Board pertaining to COVID-19 are made by a member of the public and not the patient of the physician. In some COVID-19 related investigations, the Board is unable to identify any specific patients who have been treated by the physician in question. Without a patient's name, it is impossible to obtain their consent for records and the Board will be unable to identify what patient records to seek in an investigative subpoena." MBC notes that its request for enhanced authority to inspect medical records would assist in overcoming this challenge.  MBC also states that "The definition of 'misinformation' is unclear and may lead to legal challenges following the imposition of discipline under this proposed law. MBC requests that the definition be updated to read  "Misinformation" means false information that is contradicted by contemporary scientific consensus *contrary to the standard of care* ~~to an extent where its dissemination constitutes gross negligence by the licensee~~.

Physicians and surgeons are not the only licensed health care providers licensed who may engage in practices that this bill seeks to address.  In 2022, the Senate Committee on Business, Professions, and Economic Development, in coordination with the Assembly Committee on Business and Professions, asked questions through the sunset review oversight process about efforts health care licensing

programs are undertaking in order to curb the spread of medical misinformation. One example was highlighted in a staff prepared background paper for the sunset review oversight of the Board of Chiropractic Examiners noting that in Spring 2020, that board reported that several complaints were received about licensed doctors of chiropractic who were advertising that chiropractic care can help patients reduce their risk of COVID-19 infection. That board investigated the complaints, and the licensees subsequently removed advertisements from their websites. Given that many additional licensed health care providers also have a "high degree of public trust and therefore must be held accountable for the information they spread", as the Author notes for physicians and surgeons in identifying the rationale for this measure, it is unclear why only one category of professional would be specified through statue designating their activities as unprofessional conduct.

**FISCAL EFFECT:**  Appropriation:  No   Fiscal Com.:   Yes   Local:  No

According to the Senate Appropriations Committee, OMBC estimates a fiscal impact of $10,000 and MBC anticipates any fiscal impact to be absorbable within existing resources as the board currently implements an allegation code for COVID-19 related complaints and tracks discipline related to unprofessional conduct. Actual enforcement costs to the MBC and OMBC are indeterminate and would depend on the volume of complaints received specific to COVID-19 misinformation and disinformation, as well as the complexity of any subsequent investigations. The Office of Information Services within the Department of Consumer Affairs estimates $1,600 for workload associated with making information technology changes.

**SUPPORT:**  (Verified  8/11/22)

California Medical Association (source)
American Academy of Pediatrics, California
American College of Emergency Physicians, California Chapter
American College of Obstetricians and Gynecologists District IX
California Podiatric Medical Association
California Rheumatology Alliance
California Society of Anesthesiologists
Children's Specialty Care Coalition
County Health Executives Association of California
Families for Opening Carlsbad Schools
Pandemic Patients

Protect US
Teens for Vaccines, Inc.

**OPPOSITION:** (Verified  8/11/22)

A Voice for Choice Advocacy
Association of American Physicians and Surgeons
California Health Coalition Advocacy
Californians for Good Governance
Catholic Families 4 Freedom, California
Central Coast Health Coalition
Children's Health Defense California Chapter
Coalition for Informed Consent
Concerned Women for America
Depression and Bipolar Support Alliance, California
Educate. Advocate.
Family Details LLC
Frederick Douglass Foundation of California
Freedom Keepers United, California Freedom Keepers
Front Line Covid-19 Critical Care Alliance
Homewatch Caregivers of Huntington Beach
Natomas USD for Freedom
Not On Our Watch
Nuremberg 2.0 Ltd.
Pacific Justice Institute
Physicians for Informed Consent
Protection of The Educational Rights for Kids
Real Impact.
Restore Childhood
Siskiyou Conservative Republicans
Stand Up Sacramento County
Towards an Internet of Living Beings
Whittier Parents for Choice

**ARGUMENTS IN SUPPORT:** Supporters write that licensed physicians possess
a high degree of public trust and therefore have a powerful platform in society.
When they choose to spread inaccurate information, physicians contradict their
responsibilities and further erode public trust in the medical profession. By passing
this bill, California will demonstrate its unwavering support for a scientifically
informed populous to protect ourselves from COVID-19. The California Medical
Association notes that "While the MBC may have the ability to discipline licensees

for unprofessional conduct under Business and Professions Code section 2234, AB 2098 makes clear that the MBC has the statutory authority to take such actions against physicians that spread COVID-19 misinformation or disinformation." Supporters state that health misinformation is a serious threat to public health that can cause confusion, sow mistrust, harm people's health, and undermine public health efforts.

**ARGUMENTS IN OPPOSITION:**   According to A Voice for Choice Advocacy, "While we agree that physicians and surgeons should be disciplined for maliciously sharing misinformation and disinformation, there are already measures in place for the California Medical Board to discipline for such offenses. Furthermore, AB 2098 is overly broad and would be impossible to implement because there is no definition and no established 'standard of care' or 'contemporary scientific consensus' for treating SARS-COV-2/COVID-19." Opponents also note that doctors should be allowed to voice their medical and professional opinions freely and state that an unintended consequence of this bill might be that the healthcare provider shortage would be exacerbated.  Opponents also express concerns about unconstitutional restrictions on free speech.

ASSEMBLY FLOOR:  53-20, 5/26/22
AYES:  Aguiar-Curry, Arambula, Bauer-Kahan, Bennett, Bloom, Boerner Horvath, Mia Bonta, Bryan, Calderon, Carrillo, Cervantes, Cooper, Daly, Mike Fong, Friedman, Gabriel, Cristina Garcia, Eduardo Garcia, Gipson, Gray, Haney, Holden, Irwin, Jones-Sawyer, Kalra, Lee, Levine, Low, Maienschein, McCarty, Medina, Mullin, Muratsuchi, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Blanca Rubio, Salas, Santiago, Stone, Ting, Villapudua, Ward, Akilah Weber, Wicks, Wilson, Wood, Rendon
NOES:  Bigelow, Chen, Choi, Cooley, Cunningham, Megan Dahle, Davies, Flora, Fong, Gallagher, Kiley, Lackey, Mathis, Nguyen, Patterson, Seyarto, Smith, Valladares, Voepel, Waldron
NO VOTE RECORDED:  Berman, Grayson, Mayes, Nazarian, O'Donnell

Prepared by:   Sarah Mason / B., P. & E.D. /
8/13/22 9:49:29

**\*\*\*\*  END  \*\*\*\***

# EXHIBIT F

CONCURRENCE IN SENATE AMENDMENTS
AB 2098 (Low)
As Amended  August 22, 2022
Majority vote

## SUMMARY

Expressly provides that the dissemination of misinformation or disinformation related to COVID-19 by physicians and surgeons constitutes unprofessional conduct.

**Senate Amendments**

1) Strikes the requirement that the Medical Board of California (MBC) or the Osteopathic Medical Board of California (OMBC) must consider certain factors prior to bringing a disciplinary action against a licensee under this bill.

2) Adjusts the definition of "misinformation" to mean false information that is contradicted by contemporary scientific consensus contrary to the standard of care.

3) Rearranges this bill's definitions so that they are listed in alphabetical order.

## COMMENTS

*Misinformation and Disinformation.*  This bill is intended to target three types of false or misleading information relating to the COVID-19 pandemic.  First, the language refers to nonfactual information regarding "the nature and risks of the virus" – for example, misleadingly comparing COVID-19 to less serious conditions or inaccurately characterizing the deadliness of the disease.  Second, the bill seeks to address false statements regarding its "prevention and treatment" – this would presumably include treatments and therapies that have no proven effectiveness against the virus.  The third category is for misinformation or disinformation regarding "the development, safety, and effectiveness of COVID-19 vaccines."

Public skepticism and misunderstanding of diseases, treatments, and immunizations is not unique to COVID-19.  The earliest known group formed to oppose vaccination programs, the National Anti-Vaccination League, was established in the United Kingdom in 1866 following a series of violent protests against mandatory smallpox immunizations in the Vaccination Act of 1853.  In 1918, conspiracy theories were circulated that the Spanish Flu pandemic was a deliberate act of biological warfare, spread through aspirin manufactured by German company Bayer.

What has been historically unprecedented about the dissemination of misinformation and disinformation throughout the COVID-19 pandemic is the omnipresence of media coverage and the prevalence of social media.  False information can easily be spread to millions within days or even hours of it being created.  It can become challenging for a population already feeling overloaded with complex information to differentiate between thoroughly researched, accurate reporting and information that is oversimplified, unproven, or patently false.

A substantial factor in the spread of false information is a phenomenon known as "confirmation bias."  When individuals hold a preexisting belief or suspicion, they will often unconsciously seek out information to validate that predisposition and filter out contradictory evidence.  The persistence of modern media exposure and the internet has exacerbated this effect, as information seeming to support virtually any viewpoint or understanding can now easily be found through the

use of search engines and social media.  Many websites further exacerbate the issue of confirmation bias by algorithmically delivering consistent information to users who have demonstrated a pattern of belief or ideology.

The role of physicians and other health professionals in legitimizing false information during the COVID-19 pandemic has presented serious implications for public safety.  For example, the federal Centers for Disease Control and Prevention (CDC) has for decades been recognized as the United States government's primary agency for protecting Americans through expert research and advice related to the control and prevention of communicable disease.  The CDC has consistently warned Americans about the threat of COVID-19 and strongly encouraged vaccination.  However, throughout the pandemic, many individuals who are predisposed toward skepticism of the government and incredulity toward vaccines have sought to validate those views, despite unambiguous guidance to the contrary from leading health experts.

As a result, health practitioners whose views on COVID-19 and immunization against it are within the extreme minority for their profession are armed with a disproportionately loud voice in the public discourse.  Antigovernment cynics and vaccine skeptics cohere to the opinions of those few physicians who will reinforce their beliefs as they seek to appeal to authority in service of their confirmation bias.  The effect of this is that a relatively small group of public health contrarians who are licensed as physicians will be afforded the same, if not more, credibility as long-trusted public institutions like the CDC, the FDA, and the American Medical Association, even if those physicians do not specialize in epidemiology or infectious disease prevention.

The incongruity of this reasoning is frequently rationalized in part through conspiracy theories about the medical establishment.  This is not novel.  When allopathic medicine first achieved dominance during the Progressive Era, there were many who vilified the medical system as financially motivated, accusing "modern medicine men" of oppressing natural therapies in order to profit from a monopoly on health care practice.  Other related conspiracy theories frequently involve the United States government, which has been accused of everything from inventing or exaggerating the pandemic to suppressing natural remedies, or even using COVID-19 vaccines as a clandestine method for implanting microchips into Americans.

*Role of State Medical Boards.*  Physicians and surgeons in California are regulated by one of two entities: the Medical Board of California (MBC) or the Osteopathic Medical Board of California (OMBC).  The MBC licenses and regulates about 153,000 physicians while the OMBC licenses and regulates slightly over 12,000.  Despite receiving different forms of medical education and being overseen by separate boards, the essential scope of practice for these two categories of licensees are virtually identical.

In July of 2021, the Federation of State Medical Boards (FSMB) issued a statement positioned as being "in response to a dramatic increase in the dissemination of COVID-19 vaccine misinformation and disinformation by physicians and other health care professionals on social media platforms, online and in the media."  The FSMB warned that physicians who engage in the spread of false information related to COVID-19 were jeopardizing their licenses to practice medicine.  While physicians are subject to discipline only by boards located in states where they hold a license, the FSMB's statement was viewed as a serious warning to doctors that they risked disciplinary action if they engaged in spreading inaccurate information.

Following the FSMB's statement, some state medical boards appeared poised to take action against licensees found to be spreading misinformation or disinformation.  Tennessee's Board of

Medical Examiners adopted the FSMB's statement as their own.  However, in response, the state's Republican legislature threatened to disband the board if it sought to take any such action against a physician.  Legislation in at least fourteen states has been introduced to prevent medical boards from holding physicians who spread false information accountable in accordance with the FSMB's guidance.

In contrast to legislative action taken in those states, this bill would seek to confirm that in California, physicians who disseminate COVID-19 misinformation or disinformation are indeed subject to formal discipline.  The bill would expressly establish that such dissemination would constitute "unprofessional conduct" – a term used prolifically in the Medical Practice Act as a general description of numerous forms of conduct for which disciplinary action may be taken.  The MBC or OMBC would be authorized to take enforcement action against physicians who have used their licenses to jeopardize public health and safety through the spread of false information.

It is certainly meaningful that this bill would establish as a matter of California law that physicians are subject to discipline for spreading false information.  However, it is more than likely that the MBC and OMBC are both already fully capable of bringing an accusation against a physician for this type of misconduct.  For example, the Medical Practice Act includes "gross negligence" and "repeated negligent acts" within the meaning of unprofessional conduct, representing situations where the physician deviated from the standard of care in the opinion of the MBC and its expert medical reviewers.

If, for example, a physician were to advise patients to inject disinfectant as a way of treating COVID-19 – as former President Trump once did, resulting in a sharp rise in reported incidents of misusing bleach and other cleaning products – disseminating that "misinformation" would almost certainly be considered negligent care subject to discipline.  Whether a case of spreading misinformation is sufficient to bring an action for gross negligence would be evaluated using the MBC's expert reviewer guidelines, which provide that "the determining factor is the *degree* of departure from the applicable standard of care."  Similarly, it is arguable that spreading "disinformation" as commonly defined would constitute an "act of dishonesty or corruption"— also statutorily included within the Medical Practice Act's meaning of unprofessional conduct.

Those in opposition to this bill have expressed concern that the MBC would overzealously prosecute doctors for expressing views that are outside the mainstream but not indisputably unreasonable based on the physician's research and training.  This apprehension cannot easily be reconciled with persistent criticisms levied against the MBC by the Legislature and patient safety advocates, who have repeatedly reproved the board for its underwhelming enforcement activities.  Major news editorials have pointed out that the MBC only takes formal disciplinary action in about three percent of cases, and that more than 80 percent of complaints are dismissed without investigation.  As the Legislature persists in its admonishment of the MBC for failing to take aggressive action against physicians who commit unprofessional conduct, it would appear dubious that the board would excessively utilize the authority expressly provided by this bill.

It stands to reason that Californians who have demonstrated suspicion toward both the medical establishment and their government would be slow to trust the MBC, with a majority of its members consisting of physicians appointed by the Governor.  However, the degree of enmity recently exhibited by physicians and others opposed to COVID-19 prevention policies could be viewed as disturbing.  In December of 2021, it was reported that representatives of an anti-

vaccination organization called America's Frontline Doctors had stalked and intimidated Kristina Lawson, President of the MBC.  This harassment was escalated in April of 2022 when that same organization "released a 21-minute video that depicts Lawson in Nazi regalia, a whip in her hand and swastika on her shoulder, and shows a clip of the garage confrontation validating Lawson's description."

America's Frontline Doctors was founded by Dr. Simone Gold, who holds an active license in California as a physician.  Dr. Gold and her organization have vociferously promoted hydroxychloroquine as a COVID-19 treatment, despite evidence increasingly showing it to be ineffective and potentially unsafe.  Dr. Gold has engaged in multiple campaigns to stoke public distrust in COVID-19 vaccines, characterizing them as "experimental" despite numerous safety and efficacy trials successfully confirming their safety and efficacy.  Dr. Gold spoke at a rally held in conjunction with the attempted insurrection on the United States Capitol on January 6, 2021; she was arrested and subsequently pleaded guilty to a misdemeanor relating to that event.

Despite what would appear to be repeated conduct perpetrated by Dr. Gold involving the dissemination of false information regarding COVID-19, Dr. Gold's license remains active with the MBC and there appears to be no record of any disciplinary action taken against her.  Given the air of legitimacy she sustains from her status as a licensed physician, Dr. Gold likely serves as an illustrative example of the type of behavior that the author of this bill seeks to unequivocally establish as constituting unprofessional conduct for physicians in California. Regardless of whether similar authority is already available to the MBC through other enforceable provisions in the Medical Practice Act, it is understandable that the author desires to make this authority explicit and confirm that doctors licensed in California who disseminate misinformation or disinformation should be held fully accountable.

**According to the Author**
"AB 2098 is crucial to addressing the amplification of misinformation and disinformation related to the COVID-19 pandemic. Licensed physicians, doctors, and surgeons possess a high degree of public trust and therefore must be held accountable for the information they spread. Providing patients with accurate, science-based information on the pandemic and COVID-19 vaccinations is imperative to protecting public health. By passing this legislation, California will show its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

**Arguments in Support**
The *California Medical Association* (CMA) is co-sponsoring this bill.  According to the CMA: "The COVID-19 pandemic has unfortunately led to increasing amounts of misinformation and disinformation related to the disease including how the virus is transmitted, promoting untested treatments and cures, and calling into question public health efforts such as masking and vaccinations. Many health professionals, including physicians, have been the culprits of this misinformation and disinformation effort."

*ProtectUS* is co-sponsoring this bill, writing: "Licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. They have a professional and ethical obligation to counsel and treat patients based not on their own opinion or beliefs, but on medical guidelines and peer-reviewed scientific evidence. When they choose to spread inaccurate information and lend credibility to conspiracy theories, physicians discourage patients from accessing life-saving vaccines. And their actions disproportionately affect the most

vulnerable members of society—those who have the least access to credible information, and the fewest resources available should they become sick."

**Arguments in Opposition**

*A Voice for Choice Advocacy* opposes this bill, writing: "While we agree that physicians and surgeons should be disciplined for maliciously sharing misinformation and disinformation, there are already measures in place for the California Medical Board to discipline for such offenses. Furthermore, AB 2098 is overly broad and would be impossible to implement because there is no definition and no established 'standard of care' or 'contemporary scientific consensus' for treating SARS-COV-2/COVID-19."

*Californians for Good Governance* opposes this bill "based on concerns about its unconstitutional restrictions on free speech." The organization argues that "while the state may be able to claim that providing the public with accurate information regarding Covid-19 is a compelling interest, it cannot possibly argue that the blunt weapon that AB 2098 represents is narrowly tailored to that interest." The organization further states that "in a country such as ours, which was established on the foundation of civil liberties such as free speech, the truth is something hashed out in the marketplace of ideas, rather than dictated by the government."

## FISCAL COMMENTS

According to the Senate Appropriations Committee, the OMBC estimates a fiscal impact of $10,000, which is anticipated to be absorbable within existing resources; the MBC anticipates any fiscal impact to be absorbable within existing resources as the board currently implements an allegation code for COVID-19 related complaints and tracks discipline related to unprofessional conduct; actual enforcement costs to the MBC and OMBC are indeterminate and would depend on the volume of complaints received specific to COVID-19 misinformation and disinformation, as well as the complexity of any subsequent investigations. The Office of Information Services within the Department of Consumer Affairs estimates $1,600 for workload associated with making information technology changes.

## VOTES:

**ASM BUSINESS AND PROFESSIONS: 12-5-2**
**YES:** Berman, Bloom, Mia Bonta, Gipson, Irwin, Lee, McCarty, Medina, Mullin, Ward, Ting, Akilah Weber
**NO:** Flora, Chen, Cunningham, Megan Dahle, Fong
**ABS, ABST OR NV:** Grayson, Arambula

**ASM APPROPRIATIONS: 12-4-0**
**YES:** Holden, Bryan, Calderon, Carrillo, Mike Fong, Gabriel, Eduardo Garcia, Jones-Sawyer, Quirk, Robert Rivas, Akilah Weber, Wilson
**NO:** Bigelow, Megan Dahle, Davies, Fong

**ASSEMBLY FLOOR: 53-20-5**
**YES:** Aguiar-Curry, Arambula, Bauer-Kahan, Bennett, Bloom, Boerner Horvath, Mia Bonta, Bryan, Calderon, Carrillo, Cervantes, Cooper, Daly, Mike Fong, Friedman, Gabriel, Cristina Garcia, Eduardo Garcia, Gipson, Gray, Haney, Holden, Irwin, Jones-Sawyer, Kalra, Lee, Levine, Low, Maienschein, McCarty, Medina, Mullin, Muratsuchi, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Blanca Rubio, Salas, Santiago, Stone, Ting, Villapudua, Ward, Akilah Weber, Wicks, Wilson, Wood, Rendon
**NO:** Bigelow, Chen, Choi, Cooley, Cunningham, Megan Dahle, Davies, Flora, Fong, Gallagher, Kiley, Lackey, Mathis, Nguyen, Patterson, Seyarto, Smith, Valladares, Voepel, Waldron
**ABS, ABST OR NV:** Berman, Grayson, Mayes, Nazarian, O'Donnell

**SENATE FLOOR: 32-8-0**
**YES:** Allen, Archuleta, Atkins, Becker, Bradford, Caballero, Cortese, Dodd, Durazo, Eggman, Glazer, Gonzalez, Hertzberg, Hueso, Hurtado, Kamlager, Laird, Leyva, Limón, McGuire, Min, Newman, Ochoa Bogh, Pan, Portantino, Roth, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**NO:** Bates, Borgeas, Dahle, Grove, Jones, Melendez, Nielsen, Wilk

## UPDATED

VERSION: August 22, 2022

CONSULTANT:  Robert Sumner / B. & P. / (916) 319-3301                    FN: 0004498

# EXHIBIT G

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS          Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

Present: **HONORABLE FRED W. SLAUGHTER, UNITED STATES DISTRICT JUDGE**

| Melissa H. Kunig | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

Attorneys Present for Plaintiffs:          Attorneys Present for Defendants:

Not Present          Not Present

**PROCEEDINGS: ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION [71]**

Before the court is Plaintiffs Mark McDonald and Jeff Barke's ("Plaintiffs") Second Motion for Preliminary Injunction. (Dkt. 71 ("Motion" or "Mot.").) Defendants Kristina D. Lawson, in her official capacity as President of the Medical Board of California; Randy W. Hawkins, in his official capacity as Vice President of the Medical Board of California; Laurie Rose Lubiano, in her official capacity as Secretary of the Medical Board of California; Michelle Anne Bholat, David E. Ryu, Ryan Brooks, James M. Healzer, Asif Mahmood, Nicole A. Jeong, Richard E. Thorp, Veling Tsai, and Eserick Watkins, in their official capacities as members of the Medical Board of California; and Robert Bonta, in his official capacity at Attorney General of California (collectively, "Defendants"), oppose the Motion. (Dkt. 73 ("Opposition" or "Opp.").) The matter is fully briefed. (*See* Dkt. 75 ("Reply").) The court held oral argument on the Motion on December 16, 2022.

Based on the record, as applied to the applicable law, the court **DENIES** the Motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.: 8:22-cv-01805-FWS-ADS              Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

## I.   Relevant Background

### A.   Plaintiffs

Dr. Jeff Barke is a physician and Dr. Mark McDonald is a psychiatrist, and both are licensed to practice medicine in California.  (Dkts. 71-2 ("McDonald Decl.) ¶ 2; 71-3 ("Barke Decl.") ¶ 2.)  Dr. Barke operates a concierge medical practice in California, while Dr. McDonald owns a psychiatric practice in the Los Angeles area. (McDonald Decl. ¶ 2; Barke Decl. ¶ 2.)  With the exception of the Medical Board of California's pending investigation against Dr. McDonald, neither has previously been disciplined by any medical regulatory authority, had his medical license suspended, or had a complaint against him sustained for unprofessional conduct.  (McDonald Decl. ¶ 29; Barke Decl. ¶ 29.)  Plaintiffs are Board-certified in specialty practices, and remain up-to-date on continuing medical education requirements and emerging medical research.  (McDonald Decl. ¶¶ 5-7; Barke Decl. ¶¶ 5-7.)

Plaintiffs have disagreed with certain aspects of the "public health response to the COVID-19 pandemic," and each describes himself as "outspoken" about the subject. (McDonald Decl. ¶¶ 15-16; Barke Decl. ¶¶ 21-22.)  In particular, Plaintiffs objected to California's "shut-down" policies, requiring children and adults to wear masks, and the early administration of COVID-19 vaccines instead of alternative medications or supplements such as ivermectin or hydroxychloroquine.  (McDonald Decl. ¶¶ 9, 18-21; Barke Decl. ¶¶ 11, 13, 15, 23.)  Plaintiffs recommend and have recommended medical treatments based on opinions they formed from their review of medical research, but that were not necessarily in accord with the prevailing positions of the Center for Disease Control or the State of California.  (*See* McDonald Decl. ¶¶ 9-14; Barke Decl. ¶¶ 12, 16, 17-19.)  In the public sphere, Plaintiffs have "advocated publicly" about their "objections to federal and state COVID-19 policies, including on social media, in various media interviews, and in [their] own published writing." (McDonald Decl. ¶ 22; Barke Decl. ¶ 28.)

In December 2021, Dr. McDonald received notice that he was placed under investigation by the Medical Board of California based on anonymous complaints regarding "posts on Twitter/Facebook about masks [that] were flagged for spreading misinformation about Covid

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

and using derogatory terms for disabled people" and "alleg[ations]" Dr. McDonald was "spreading misinformation about Covid."  (McDonald Decl. ¶ 24.)  Dr. McDonald notes that, in his prior interactions with the Board, "the fact that the complaint was not made by an actual named patient of [his] would have ended the matter," (*id.* ¶ 26), but that he was interviewed by the Board in connection with the investigation recently in November 2022, (*id.* ¶¶ 27-28).

B.    AB 2098

AB 2098, 2021-2022 Reg. Sess. (Cal. 2022) § 1(a) (to be codified at Cal. Bus. & Prof. Code § 2270) ("AB 2098") includes several express findings of the California Legislature.  The statue begins by noting that "[t]he global spread of the SARS-CoV-2 coronavirus, or COVID-19, ha[d] claimed the lives of over 6,000,000 people worldwide, including nearly 90,000 Californians" at the time it was written.  AB 2098 § 1(a).  The statute's legislative findings state that "[d]ata from the federal Centers for Disease Control and Prevention (CDC) shows that unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated," *id.* § 1(b), and "[t]he safety and efficacy of COVID-19 vaccines have been confirmed through evaluation by the federal Food and Drug Administration (FDA) and the vaccines continue to undergo intensive safety monitoring by the CDC," *id.* § 1(c).  The Legislature also found that "[t]he spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence and placed lives at serious risk," *id.* § 1(d), and "[m]ajor news outlets have reported that some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals," *id.* § 1(e).  The Legislature's findings further cite a statement from the Federation of State Medical Boards which "warn[s] that physicians who engage in the dissemination of COVID-19 vaccine misinformation or disinformation risk losing their medical license, and that physicians have a duty to provide their patients with accurate, science-based information."  *Id.* § 1(f).

AB 2098 provides that "[i]t shall consitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines." *Id.* § 2(a).

**CIVIL MINUTES – GENERAL**                                                          **3**

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

It defines "[d]isinformation" as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead," *id.* § 2(b)(2), and "[m]isinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care," *id.* § 2(b)(4). "Disseminate means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice." *Id.* § 2(b)(3). "Physician[s] and surgeon[s]" are "person[s] licensed by the Medical Board of California or the Osteopathic Medical Board of California . . . ." *Id.* § 2(b)(5).

C.    The Broader Scheme of California's Regulation of Medical Professionals[1]

California has required those practicing medicine in the state to comport with licensing and training requirements since at least 1876. *See* 1876 Cal. Stats., ch. 518, p. 792 § 1 (1876).

_____

[1] Defendants request judicial notice of (1) the 1876 Act to Regulate the Practice of Medicine in the State of California, recorded at Stat. 1876, ch. 518, pp. 792-794, (Dkt. 73-2 ("D RJN"), Exh. A); (2) the report prepared by the Assembly Committee on Business and Professions on AB 2098 for the April 19, 2022, hearing on the bill, (*id.*, Exh. B); (3) the report prepared for the Assembly on AB 2098 for the bill's third reading, dated April 20, 2022, (*id.*, Exh. C); (4) the report prepared for the Senate Committee on Business, Professions, and Economic Development on AB 2098 for the June 27, 2022, hearing on the bill, (*id.*, Exh. D); (5) the report prepared for the Senate on AB 2098 for the bill's third reading, dated August 13, 2022, (*id.*, Exh. E); and (6) the report prepared for the Assembly on AB 2098 for the vote on the concurrence on Senate Amendments, dated August 22, 2022, (*id.*, Exh. F). The court **GRANTS** Defendants' requests as to Exhibits B-F, and **DENIES AS MOOT** Defendants' request regarding Exhibit A. Exhibit A is a California statute, which the court may consider without the formal necessity of taking judicial notice. *See W. Pac. Elec. Co. Corp. v. Dragados/Flatiron*, 534 F. Supp. 3d 1209, 1224 n.14 (E.D. Cal. 2021) (noting requests for judicial notice of California statutes are "unnecessary" under Federal Rule of Evidence 201 because the "[t]he court must always apply relevant state law") (citing *Glendale Assocs., Ltd. v. N.L.R.B.*, 347 F.3d 1145, 1154 (9th Cir. 2003)). Exhibits B-F are administrative reports related to the legislative history for AB 2098, materials of which the court may take judicial notice. *See Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("[A court] may take judicial

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS        Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

The 1876 Act permitted licenses to be refused or revoked for unprofessional conduct. *Id.* § 10 ("The Boards of Examiners may refuse certificates to individuals guilty of unprofessional or dishonorable conduct, and they may revoke certificates for like causes."). California courts have found such "unprofessional conduct" to include, in some circumstances, a medical practitioner's speech to patients. *See, e.g.*, *Fuller v. Bd. of Med. Exam'rs*, 14 Cal. App. 2d 734, 740-41 (1936), *abrogated on other grounds as recognized by Hughes v. Bd. of Architectural Exam'rs*, 17 Cal. 4th 763, 784-85 (1998) (upholding sanctions on physician charged with unprofessional conduct who made false claims about his ability to treat hernias).

California law provides that the Medical Board of California is responsible for issuing or denying licenses to medical practicioners under its jurisdiction, disciplining those practicioners based on findings of unprofessional conduct, and, as a general matter, enforcing the Medical Practice Act. Cal. Bus. & Prof. Code § 2004. The Board investigates complaints "from the public, other licensees, from health care facilities or from the [B]oard that a physician and surgeon may be guilty of unprofessional conduct." *Id.* § 2220(a). Prior to the Board taking formal disciplinary action and commencing disciplinary proceedings, these investigations are conducted on a confidential basis. (Dkt. 73-1 ("Prasifka Decl.") ¶ 7.)[2] California law provides that "[p]rotection of the public shall be the highest priority for the Medical Board of California in exercising its licensing, regulatory, and disciplinary functions." *Id.* § 2001.1.

California law states that the Board "shall take action against any licensee who is charged with unprofessional conduct." *Id.* § 2234. The definition of "unprofessional conduct" includes "[t]he commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician and surgeon," *id.* § 2234(e); "[t]he failure of a physician and surgeon to maintain adequate and accurate records relating to the provision

---

notice of records and reports of administrative bodies.") (citation and internal quotation marks omitted); *id.* ("Legislative history is properly a subject of judicial notice.") (citation omitted); *Chaker v. Crogan*, 428 F.3d 1215, 1223 n.8 (9th Cir. 2005) (taking judicial notice of the legislative history of California Penal Code § 148.6).
[2] Mr. Prasifka is the Executive Director of the Medical Board of California, Department of Consumer Affairs. (Prasifka Decl. ¶ 1.)

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS      Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

of services to their patients," *id.* § 2266; the willful failure to comply with requirements relating to obtaining informed consent for sterilization procedures, *id.* § 2250; and the "conviction of any offense substantially related to the qualifications, functions, or duties of a physician and surgeon," *id.* § 2236. More generally, "gross negligence," "repeated negligent acts," and "incompetence" are included in the definition of "unprofessional conduct." *Id.* § 2234(b), (c), (d). Under California law, "gross negligence" is defined as "the want of even scant care or an extreme departure from the ordinary standard of conduct," *Franz v. Bd. of Med. Quality Assurance*, 31 Cal. 3d 124, 138 (1982) (citations omitted); "negligence" is a "simple departure" from the current standard of care, (Dkt. 74 ("Nuovo Decl.") ¶ 4)[3]; and the "term incompetency generally indicates an absence of qualification, ability or fitness to perform a prescribed duty or function," *Kearl v. Bd. of Med. Quality Assurance*, 189 Cal. App. 3d 1040, 1054 (1986) (citation and internal quotation marks omitted).

The "standard of care" for medical practitioners is the reasonable degree of skill, knowledge, and care as that of practitioners under similar circumstances. *See, e.g.*, *Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 8 Cal. 4th 992, 1001 (1994). Typically, the standard of care is established through expert testimony. *See, e.g.*, *Lattimore v. Dickey*, 239 Cal. App. 4th 959, 968 (2015). The "'essential factor' in determining the qualification of an expert witness in medical malpractice cases 'is knowledge of similarity of conditions.'" *Avivi v. Centro Medico Urgente Med. Ctr.*, 159 Cal. App. 4th 463, 468 (2008) (quoting *Sinz v. Owens* 33 Cal.2d 749, 756 (1949)).

D.  <u>The Motion</u>

Plaintiffs challenge the constitutionality of AB 2098 on two grounds: (1) that AB 2098 is an impermissible content- and viewpoint- based restriction on speech implemented by the government in violation of the right to free speech protected by the First Amendment; and (2) that AB 2098 is void for vagueness under the Due Process Clause of the Fourteenth

---

[3] Dr. Nuovo is the Chief Medical Consultant for the California Medical Board, who has "reviewed cases of professional misconduct for the Board since April 1993." (Nuovo Decl. ¶ 1.)

---

**CIVIL MINUTES – GENERAL**      **6**

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

---

Amendment.  (*See* Dkt. 68 ("FAC") ¶¶ 92-112.)  In the Motion, Plaintiffs seek to enjoin AB 2098 before it becomes effective on January 1, 2023.

## II.  Legal Standard

### A.  Preliminary Injunction

"A preliminary injunction is an extraordinary remedy that may be awarded only if the plaintiff clearly shows entitlement to such relief."  *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  A plaintiff seeking a preliminary injunction must demonstrate (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) that "the balance of equities tips in [their] favor"; and (4) that "an injunction is in the public interest."  *Id.* (quoting *Winter*, 555 U.S. at 20).  "The first factor under *Winter* is the most important," to the extent the court need not consider the remaining three elements where a plaintiff fails to show a likelihood of success on the merits.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (citations omitted).  Courts in the Ninth Circuit "also employ an alternative serious questions standard, also known as the sliding scale variant of the *Winter* standard."  *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (cleaned up).  Under that formulation, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiffs can support issuance of a preliminary injunction, so long as the plaintiffs also show that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* (alterations and internal quotation marks omitted) (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

## III.  Discussion

### A.  Plaintiffs' Standing

Defendants argue Plaintiffs lack Article III standing because neither has alleged a sufficiently imminent threat of enforcement to sustain a pre-enforcement claim, and otherwise

---

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

have not adequately pleaded an injury in fact. (Opp. at 7-10.) Plaintiffs maintain the chilling effect of AB 2908 on their ability to provide medical advice to their patients sufficiently establishes standing, especially when coupled with the state's enthusiasm to enforce AB 2098 and Plaintiffs' asserted vagueness in the statute. (Reply at 4-10.)

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, --- U.S. ----, 141 S. Ct. 2190, 2203 (June 25, 2021) (citation omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk"' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013)).

"Constitutional challenges based on the First Amendment present unique standing considerations." *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). In light of the "chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Id.* (citing *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965); *Bland v. Fessler*, 88 F.3d 729, 736-37 (9th Cir. 1996)). Accordingly, a "chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not based on a fear of future injury that itself is too speculative to confer standing." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020) (cleaned up).

A plaintiff satisfies the injury-in-fact requirement required for pre-enforcement standing where the plaintiff "alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159 (citation and internal quotation marks omitted). Courts in the Ninth Circuit "consider (1) whether the plaintiff has a 'concrete plan' to violate the law, (2) whether the enforcement authorities have 'communicated a specific warning

---

**CIVIL MINUTES – GENERAL**                                                    **8**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

or threat to initiate proceedings,' and (3) whether there is a 'history of past prosecution or enforcement.'" *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)).

The court previously dismissed Plaintiffs' initial complaint and concurrent motion for preliminary injunction based on the court's finding Plaintiffs lacked Article III standing. (Dkt. 68.) On the record before it, the court finds Plaintiffs' renewed materials adequately demonstrate standing.

The court finds the first factor weighs in favor of finding Plaintiffs have sufficiently demonstrated standing. Plaintiffs have submitted they have, for example, "raised concerns about the new vaccines developed to combat COVID-19," (Barke Decl. ¶ 27; *accord* McDonald Decl ¶ 21; FAC ¶¶ 49-50, 86-87), a position in tension with AB 2098's legislative findings that the "safety and efficacy of COVID-19 vaccines have been confirmed," AB 2098 § 1(c), and reduce the risk of death elevenfold, *id.* § 1(b). Plaintiffs continue to recommend medical treatments based on opinions they form from their review of medical research, and such opinions have previously not aligned with the positions of the Center for Disease Control or the State of California. (*See* McDonald Decl. ¶¶ 9-14; Barke Decl. ¶¶ 12, 16, 17-19; FAC ¶¶ 38-76.) For the purposes of standing, the court finds Plaintiffs have sufficiently established a "concrete plan to violate" AB 2098 within the meaning of the applicable doctrine. *See Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (holding plaintiff's members who "maintain[ed] policies that [were] presently in conflict with [the challenged California Assembly Bill], according to [] allegations in the complaint," were "deemed to have articulated a concrete plan to violate it" for purposes of standing) (citations and internal quotation marks omitted), *cert. denied sub nom. California Trucking Ass'n, Inc. v. Bonta*, 142 S. Ct. 2903 (2022). While Defendants note the text of AB 2098 does not cover public advocacy, (*see* Opp. at 13), which ostensibly suggests that the pending investigation against Dr. McDonald is not related to the statute itself, the court nonetheless finds Plaintiffs' other allegations and supporting declarations are sufficient to find this factor favors finding standing.

The second factor also weighs in favor of finding Plaintiffs have standing. Defendants principally argue that Plaintiffs both aver their medical advice and treatments have always

---

**CIVIL MINUTES – GENERAL**                                          **9**

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                 Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

complied with the applicable standard of care, and liability under AB 2098 only attaches where a medical professional violates the standard of care. (*See* Opp. at 8 (citing McDonald Decl. ¶ 12; Barke Decl. ¶ 18).) But this statement of Plaintiffs' *belief* is not necessarily determinative of the possibility AB 2098 could be enforced against them; as noted above, Plaintiffs also aver that their opinions have, at times, been at odds with those of medical authorities. Importantly, Defendants' have not "disavow[ed] enforcement" of AB 2098 against Plaintiffs specifically during this litigation, which the court may consider as "strong evidence that [California] intends to enforce the law." *See Cal. Trucking*, 996 F.3d at 653. Moreover, in "in a pre-enforcement challenge that alleges a free speech violation under the First Amendment," the plaintiff "need only demonstrate that a threat of potential enforcement will cause him to self-censor, and not follow through with his concrete plan to engage in protected conduct." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014). Here, Plaintiffs have alleged AB 2098 will "force[] [them] to choose between providing [their] best medical judgment and censoring that judgment to comply with the law" based on the their "fear that the [Medical] Board [of California] will use this new authority to threaten [their] medical license[s]," and submitted specific facts to support the reasonableness of that fear. (Barke Decl. ¶ 35; *accord* McDonald Decl. ¶ 35; FAC ¶¶ 60, 91.) In light of these considerations, the court finds the second factor weighs in favor of finding standing.

Because the record indicates AB 2098, as a statute that is not yet effective, has no history of enforcement, the third factor weighs against finding Plaintiffs have standing. However, "the history of enforcement, carries little weight when the challenged law is relatively new and the record contains little information as to enforcement." *Tingley*, 47 F.4th at 1069 (9th Cir. 2022) (citation and internal quotation marks omitted). Accordingly, "[t]he sparse enforcement history weighs against standing but 'is not dispositive.'" *Id.* (citations and internal quotation marks omitted).

Taking into account Plaintiffs' declarations, the FAC, and AB 2098's text, the court finds Plaintiffs' "fear [of prosecution] is reasonable." *See Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1173 (9th Cir. 2018); *Tingley*, 47 F.4th at 1069 (holding plaintiff satisfied Article III's standing requirement where "the first two factors [were] satisfied by [the complaint's] "'general

---

**CIVIL MINUTES – GENERAL**

10

_____

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

factual allegations of injury'" and there was a limited history of prosecution under the
challenged statute because it was recently enacted).

   B.   Likelihood of Success on the Merits of Plaintiffs' Void-for-Vagueness Challenge

      1.   *Vagueness*

   Plaintiffs assert AB 2098 is void for vagueness, challenging its language as too
ambiguous and broad such that the statute (1) fails to put a person of ordinary intelligence on
notice of the conduct it prohibits; and (2) invites arbitrary enforcement.  (Mot. at 26-28; Reply
at 10-15.)  Defendants argue AB 2098's definitions provide adequate context such that a
medical practitioner of ordinary intelligence would understand its requirements, noting that the
measure incorporates standards familiar to California's laws regulating medical practice.  (Opp.
at 24-28.)

   "[A]n enactment is void for vagueness if its prohibitions are not clearly defined."
*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The vagueness doctrine "incorporates
two related requirements."  *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2019).  "First,
'laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is
prohibited, so that he may act accordingly.'"  *Id.* (alteration in original) (quoting *Grayned*, 408
U.S. at 108).  Second, the "vagueness doctrine's second requirement aims to avoid 'arbitrary
and discriminatory enforcement,' and demands laws 'provide explicit standards for those who
apply them.'"  *Id.* (quoting *Grayned*, 408 U.S. at 108).  As a general matter, "to raise a
vagueness argument, Plaintiffs' conduct must not be 'clearly' prohibited by the ordinances at
issue."  *Hunt v. City of Los Angeles*, 638 F.3d 703, 710 (9th Cir. 2011); *see also Holder v.
Humanitarian L. Project*, 561 U.S. 1, 18-19 (2010) ("A plaintiff who engages in some conduct
that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct
of others.") (citation omitted).

   The first requirement is ordinarily satisfied where the challenged law provides "'fair
notice' of the conduct [the] statute proscribes."  *Sessions v. Dimaya*, --- U.S. ----, 138 S. Ct.

_____

**CIVIL MINUTES – GENERAL**

**11**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

1204, 1212 (2018) (citation omitted).  "But where First Amendment freedoms are at stake, an even greater degree of specificity and clarity of laws is required, and courts ask whether language is sufficiently murky that speakers will be compelled to steer too far clear of any forbidden areas."  *Edge*, 929 F.3d at 664 (cleaned up).  However, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Humanitarian L. Project*, 561 U.S. at 18 (quoting *Williams*, 553 U.S. at 304); *see also Grayned*, 408 U.S. at 110 ("Condemned to the use of words, we can never expect mathematical certainty from our language.").  "Furthermore, in analyzing whether a statute's vagueness impermissibly chills First Amendment expression, it is necessary to consider the context in which the statute operates."  *See Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1154 (9th Cir. 2001) (collecting cases).

The text of AB 2098 states that "[i]t shall consitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines."  AB 2098 § 2(a).  The statute defines "[d]isinformation" as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead," *id.* § 2(b)(2), and "[m]isinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care," *id.* § 2(b)(4).  Under AB 2098, "[d]isseminate means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice."  *Id.* § 2(b)(3).  "Physician[s] and surgeon[s]" are "person[s] licensed by the Medical Board of California or the Osteopathic Medical Board of California . . . ."  *Id.* § 2(b)(5).

Where "the plain meaning of a statute indicates a particular result, the 'judicial inquiry is complete.'"  *Salisbury v. City of Santa Monica*, 998 F.3d 852, 859 (9th Cir. 2021) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002)).  And the court "may impose a limiting construction on a statute" where a statute is "'readily susceptible' to such a construction."  *Reno v. ACLU*, 521 U.S. 844, 873 (1997) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988)).

**CIVIL MINUTES – GENERAL**

12

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

By its terms, AB 2098 applies to physicians and surgeons licensed in California.  The measure's definition of "misinformation" is comprised of three components: (1) demonstrably false information; (2) contradicted by contemporary scientific consensus; and (3) contrary to the standard of care.  Though "contrary to the standard of care" immediately follows "contradicted by contemporary scientific consensus" without a conjunction, construing the statute in light of California law's established definition of "standard of care" as the skill, knowledge, and care exercised by practitioners under similar circumstances, *see Flowers*, 8 Cal. 4th at 1001; *Lattimore*, 239 Cal. App. 4th at 968, it is apparent from the statute that the "contrary to the standard of care" requirement imposes a burden on the state to demonstrate that treatment or advice which would otherwise qualify as "false" and "contradicted by contemporary scientific consensus" must be additionally violative of that familiar standard.  Moreover, as Defendants concede, to the extent a scientific consensus is unclear, AB 2098 would not impose liability because there is nothing to contradict.  (*See* Opp. at 26.)  In other words, to be "misinformation" under AB 2098, the state must show that a scientific consensus exists, the information provided by a surgeon or physician both runs contrary to it and is demonstrably false, and providing that information in the context of treatment or advice to a patient would be contrary to the skill, knowledge, and care exercised by a like colleague in similar circumstances.  Accordingly, the court finds "misinformation" is not impermissibly vague, in that it requires, by its statutory text, a false statement of information that is contradicted by contemporary scientific consensus, which further runs afoul of the applicable standard of care.

"Disinformation" under the statute is "misinformation" that is "deliberately disseminated with malicious intent or an intent to mislead," e.g., misinformation provided with fraudulent intent.  Such a "scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *see also Cal. Tchrs. Ass'n*, 271 F.3d at 1154 (holding requirement that educator could be held liable for "refus[ing] to implement" terms of proposition so long as such refusal was done "willfully and repeatedly" was sufficient to mitigate "any vagueness" regarding proposition without necessitating a "definit[ive]

RJN_Exhibit G
Page 60

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

interpret[ation] [of] the phrase 'willfully and repeatedly'"). The court thus finds the term "disinformation" is not impermissibly vague.

Additionally, "misinformation" and "disinformation" must be propagated in a particular manner and with respect to certain subject matters to fall within AB 2098's reach. The statute penalizes the "disseminat[ion]" of "mis-" and "dis-" information, which is defined as "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice." Accordingly, AB 2098 does not reach public advocacy; its scope is limited to information provided in the context of treatment or advice of a particular patient. Finally, the statute covers only advice and treatment "related to COVID-19," and gives as examples "false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines." Thus, the statute defines the subject matter it covers.

In sum, AB 2098 defines "misinformation" and "disinformation" by reference to familiar standards of medical regulations and the opinions of the medical community; applies only to licensed physicians and surgeons; explicitly states the subject matter it covers and provides examples of covered treatment and advice; and expressly limits its reach to treatment or advice provided to a particular patient. Accordingly, the court finds that AB 2098 is not impermissibly vague as applied to licensed doctors and physicians such as Plaintiffs. *See United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (noting "terms void for vagueness lack 'statutory definitions, narrowing context, or settled legal meanings'") (quoting *Williams*, 553 U.S. at 306); *id.* (explaining "a statute's vagueness is either susceptible to judicial construction or is void for vagueness based on the application of traditional rules for statutory interpretation" the latter of which "consistently favor[] that interpretation of legislation which supports its constitutionality") (alteration in original) (internal quotation marks omitted) (citing *Bouie v. Columbia*, 378 U.S. 347, 355 n.5 (1964); *Screws v. United States*, 325 U.S. 91, 98 (1945)).

While a particular limitation included in an otherwise permissibly defined legal standard does not necessarily, "standing alone," survive a vagueness challenge, *cf. Reno*, 521 U.S. at 873, the opposite situation is presented here. AB 2098 includes, as part of its more *expansive*

**CIVIL MINUTES – GENERAL**

**14**

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

proscription of prohibited acts, those which contravenes the applicable "standard of care" long familiar to California's medical malpractice regulations, among the other limitations discussed above.  The incorporation of this term as a necessary, but not sufficient, condition predicate to liability under AB 2098 further supports the court's conclusion.  *See Gammoh v. City of La Habra*, 395 F.3d 1114, 1120 (9th Cir. 2005) ("This [C]ircuit has previously recognized that otherwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity.") (citation omitted).

Plaintiffs contend that AB 2098 is vague to the extent it creates a chilling effect on their ability to speak openly and freely with their patients when giving medical advice.  "The touchstone of a facial vagueness challenge in the First Amendment context, however, is not whether *some* amount of legitimate speech will be chilled; it is whether a *substantial* amount of legitimate speech will be chilled."  *See Cal. Tchrs. Ass'n*, 271 F.3d at 1152 (citing *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976)).  As discussed above, the court finds AB 2098 is not vague.  Moreover, given the express limitations on AB 2098's reach and explicitly defined terminology, especially considering AB 2098 does not prevent Plaintiffs or other medical professionals from publicly advocating for their views regarding the prevailing scientific consensus in any respect, the court finds the risk that the statute's margins would chill otherwise legitimate speech absent and thus insufficient to justify striking down the statute.

Accordingly, the court finds AB 2098 is not void-for-vagueness under the Fourteenth Amendment.

---

**CIVIL MINUTES – GENERAL**

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                 Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

C.    <u>Likelihood of Success on the Merits of Plaintiffs' First Amendment Claim</u>

    1.    *The Extent to Which AB 2098 Regulates Speech*

        i.    *AB 2098 Incidentally Burdens Speech as a Regulation of Professional Conduct*

Plaintiffs argue AB 2098 is unconstitutional under the First Amendment because it discriminates against speech based on its content and viewpoint. (Mot. at 15-21; Reply at 10-17.) Plaintiffs further contend that AB 2098 fails the strict scrutiny analysis under which content-based restrictions on speech are evaluated, noting the Supreme Court abrogated the "professional speech" doctrine previously recognized in this Circuit in *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), --- U.S. ----, 138 S. Ct. 2361, 2371-72 (June 26, 2018). (Mot. at 17, 21-26; Reply at 10-17.) Defendants maintain AB 2098 is a permissible regulation of medical practitioners' conduct in treating patients that only incidentally burdens speech in a manner consistent with California's similar regulations of the medical field, and thus either satisfies the applicable rational basis review or is valid regardless as part of the historical tradition of states' medical malpractice laws. (Opp. at 10-18.) Alternatively, Defendants argue that AB 2098 passes strict scrutiny if it applies, because it targets the narrow subset of speech posing the greatest risk to patient health and safety. (*Id.* at 18-24.)

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. CONST. amend. I). In evaluating a free speech claim, courts first "assess whether the law regulates speech in the first place," *Am. Soc'y of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 960 (9th Cir. 2021), *cert. denied*, 213 L. Ed. 2d 1091 (June 27, 2022), before proceeding to ask whether the statute is "content based or content neutral," *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017). The first inquiry stems from the law's treatment of "restrictions on protected expression [as] distinct from restrictions on economic activity or, [stated] more generally, on nonexpressive conduct." *Mobilize the Message LLC v. Bonta*, 50 F.4th 928, 935 (9th Cir. 2022) (quoting *Sorrell v. IMS*

---

**CIVIL MINUTES – GENERAL**

16

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS          Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

*Health Inc.*, 564 U.S. 552, 567 (2011)). Thus, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.* (quoting *Sorrell*, 564 U.S. at 567). As crucially relevant here, "States may regulate professional conduct, even though that conduct incidentally involves speech." *Tingley*, 47 F.4th at 1074 (quoting *NIFLA*, 138 S. Ct. at 2372).

As relevant here, the Ninth Circuit in *Tingley* considered the import of the Supreme Court's abrogation of the professional speech doctrine in *NIFLA* on the Circuit's previous precedent in *Pickup v. Brown*, 740 F.3d 1208, 1221 (9th Cir. 2014), *abrogated in part by NIFLA,* 138 S. Ct. 2361. "Noting that the line between conduct and speech can be difficult to discern," the Ninth Circuit "develop[ed] a continuum approach in *Pickup* for determining whether a law regulates the speech or conduct of professionals." *Tingley*, 47 F.4th at 1072 (citing *Pickup*, 740 F.3d at 1227). Prior to *NIFLA*'s partial abrogation of the "continuum" approach in *Pickup*, on one end, a medical professional's "engagem[ent] in [] public dialogue" received "robust" First Amendment protection, even if "advocat[ing] [for] a treatment that the medical establishment considers outside the mainstream, or even dangerous." *Pickup*, 740 F.3d at 1227; *Tingley*, 47 F.4th at 1072-73. On the other, was "the regulation of professional *conduct*, where the state's power is great, even though such regulation may have an incidental effect on speech." *Pickup*, 740 F.3d at 1229; *Tingley*, 47 F.4th at 1073. The Ninth Circuit in *Pickup* additionally held that speech "within the confines of a professional relationship" fell "[a]t the midpoint of the continuum," and stated the now-abrogated, categorical proposition that "First Amendment protection of a professional's speech is somewhat diminished." *Pickup*, 740 F.3d at 1228; *see Tingley*, 47 F.4th at 1073; *id.* at 1074 (noting "[t]here is no question that *NIFLA* abrogated the professional speech doctrine, and its treatment of all professional speech *per se* as being subject to intermediate scrutiny"). But ultimately, the Ninth Circuit in *Tingley* held that "[t]he Supreme Court's intervening decision in *NIFLA* [did] not require [courts] to abandon [the] analysis in *Pickup* insofar as it related to conduct," *Tingley*, 47 F.4th at 1073, and noted that the Supreme Court in *NIFLA* recognized an "exception, which corresponds to the holding in *Pickup*, [] that 'States may regulate professional conduct, even though that conduct incidentally involves speech,'" *id.* at 1074 (quoting *NIFLA*, 138 S. Ct. at 2372).

---

**CIVIL MINUTES – GENERAL**

17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

Both *Tingley* and *Pickup* concerned "nearly identical" laws banning the practice of conversion therapy in Washington and California, respectively. *See Tingley*, 47 F.4th at 1071-72 (comparing statutes). In *Pickup*, the Ninth Circuit held the statute at issue "regulate[d] conduct[,]" where it "ban[ned] a form of treatment for minors; it [did] nothing to prevent licensed therapists from discussing the pros and cons of [the treatment] with their patients." *Pickup*, 740 F.3d at 1229. Accordingly, because it "regulate[d] only treatment, while leaving mental health providers free to discuss and recommend, or recommend against, [the treatment]" the Ninth Circuit "conclude[d] that any effect [the statute] may have [had] on free speech interests [was] merely incidental." *Id.* at 1231. Finding itself bound by *Pickup*, the Ninth Circuit in *Tingley* found the Washington law satisfied rational basis review. *Tingley*, 47 F.4th at 1077-78.

In contrast, the Ninth Circuit has previously struck down a federal enforcement policy under which a doctor's license could be revoked if they recommended medical marijuana to a patient as an impermissible burden on a doctor's First Amendment speech rights. *Conant v. Walters*, 309 F.3d 629, 638-39 (9th Cir. 2002). After California decriminalized the use of marijuana for limited medical purposes and immunized physicians from prosecution under state law for recommending or approving of its use for those medical purposes, the federal government enacted a policy that "declared that a doctor's 'action of recommending or prescribing Schedule I controlled substances [to be] not consistent with the "public interest" (as that phrase is used in the federal Controlled Substances Act)' and that such action would lead to revocation of the physician's registration to prescribe controlled substances." *Id.* at 632. The Ninth Circuit reasoned that this regulation "condemn[ed] expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient." *Id.* at 637. The Circuit's analysis also referenced the facts that the government's policy sought "to punish physicians on the basis of the content of doctor-patient communications" and that "[o]nly doctor-patient conversations that include[d] discussions of the medical use of marijuana trigger[ed] the policy." *Id.*

In this case, the court finds *Pickup*'s analysis of the conduct/speech dichotomy on-point and *Conant* distinguishable. As the Ninth Circuit noted in *Pickup*, "[m]ost, if not all, medical

**CIVIL MINUTES – GENERAL**

**18**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                     Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

treatment requires speech, but that fact does not give rise to a First Amendment claim when the state bans a particular treatment." 740 F.3d at 1055. "When a drug is banned, for example, a doctor who treats patients with that drug does not have a First Amendment right to speak the words necessary to provide or administer the banned drug." *Id.* (citing *Conant*, 309 F.3d at 634-35 (noting the parties agreed that the government possessed adequate authority to ban prescribing marijuana)). As here, AB 2098 regulates only "the conveyance of ['mis-' and 'dis-'] information from the [physician or surgeon] to a patient under the [physician's or surgeon's] care in the form of treatment or advice," *see* AB 2098 § 2(b)(3), i.e., only the information underlying the covered medical professional's advice rather than their particular opinion. It "does not to prevent licensed [medical professionals] from discussing the pros and cons" of their preferred course of treatment. *See Pickup*, 740 F.3d at 1055. It only requires that, while administering medical treatment or advice to a COVID-19 patient, a doctor avoid providing demonstrably false information that is contradicted by the prevailing scientific consensus in manner violative of the standard of care. "It is the limited reach of [AB 2098] that distinguishes the present case[] from *Conant*, in which the government's policy prohibited speech *wholly apart* from the actual provision of treatment." *See id.* at 1055. "[U]nlike in *Conant*, 309 F.3d at 639, [AB 2098] allows discussions about treatment, recommendations to obtain treatment, and expressions of opinions." *See id.* at 1056. Even in *Pickup*, which considered talk therapy entirely "administered through speech," the Ninth Circuit held the statute banning conversion therapy stood "on the same First Amendment footing as other forms of medical or mental health treatment" and thus was "subject to deferential review just as are other regulations of the practice of medicine." *Id.* at 1056.

Thus, unlike the federal policy at issue in *Conant*, AB 2098 does not render the provision of a particular treatment or recommendation from a medical provider *malum in se*. *See id.*; *Conant*, 309 F.3d at 639. As noted above, AB 2098 does not prohibit a licensed professional from engaging in discussions about treatment, recommendations to obtain treatment, and expressing a particular medical opinion. It only requires that those discussions, recommendations, and opinions must not be based on, or communicate as though they were settled scientific facts, false information. AB 2098 is further confined by its requirements that a medical professional's advice must be contrary to the applicable standard of care, that it is

**CIVIL MINUTES – GENERAL**

19

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

unsupported by scientific consensus, and communicated directly to a patient under that provider's care.

Of particular relevance here, the Ninth Circuit in *Pickup*, quoting in part the district court's opinion affirmed by the Ninth Circuit in *Conant*, instructed district courts on the salient issue presented in this case:

> [D]octors are routinely held liable for giving negligent medical advice to their patients, without serious suggestion that the First Amendment protects their right to give advice that is not consistent with the accepted standard of care. A doctor "may not counsel a patient to rely on quack medicine. The First Amendment would not prohibit the doctor's loss of license for doing so."

740 F.3d at 1228 (citation omitted) (quoting *Conant v. McCaffrey*, 2000 WL 1281174, at *13 (N.D. Cal. Sept. 7, 2000), *aff'd sub nom. Conant*, 309 F.3d 629).[4]

---

[4] Though the court finds AB 2098 independently satisfies the applicable scrutiny analysis as set forth below, the court notes this passage in *Pickup* appears to foreclose a First Amendment challenge to regulations prohibiting the provision of medical advice that is inconsistent with the applicable standard of care to a patient. As discussed above, AB 2098 requires any advice or treatment falling within its ambit to be both provided to a patient within the confines of the doctor-patient relationship, and the statute's penalty subjects a covered medical provider to the potential revocation of their license to practice medicine. Accordingly, this discussion *Pickup*—which the court finds survives the Ninth Circuit's formulation of *NIFLA*'s limited abrogation of *Pickup* as set forth in *Tingley*—appears to foreclose a First Amendment challenge materially indistinguishable from Plaintiffs' First Amendment challenge to AB 2098 and may thus bind the court regardless of its independent analysis. *See Tingley*, 47 F.4th at 1073 ("*NIFLA* abrogated only the 'professional speech' doctrine—the part of *Pickup* in which we determined that speech within the confines of a professional relationship (the 'midpoint' of the continuum) categorically receives lesser scrutiny.") (citing *NIFLA*, 138 S. Ct. at 2372); *see also*

---

**CIVIL MINUTES – GENERAL**

20

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

Against this backdrop, the court finds AB 2098 regulates professional conduct, and any burden it imposes on speech is incidental to a doctor's or physician's proscribed treatment for COVID-19. *See Pickup*, 740 F.3d at 1055-56; *Tingley*, 47 F.4th at 1071-72; *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1225-26 (11th Cir. 2022) (holding any burden on speech imposed by act regulating "advising and assisting individuals or groups on appropriate nutrition intake by integrating information from the nutrition assessment" was "an incidental part of regulating the profession's conduct" despite the fact that "a dietician or nutritionist must get information from her clients and convey her advice and recommendations" because the underlying information and assessment of client's needs were not speech), *cert. denied sub nom. Del Castillo v. Ladapo*, No. 22-135, 2022 WL 17408180 (U.S. Dec. 5, 2022); *cf. Doe v. Rokita*, 54 F.4th 518, 520-21 (7th Cir. 2022) (stating *NIFLA* "holds that physicians' speech is not exempt from analysis under the First Amendment and that a state may not enforce requirements disconnected from medical care. But it does not question the propriety of requirements that medical professionals alert patients to laws that affect medical choices.").

> ii.     *AB 2098 is Rationally Related to a Legitimate State Interest*

Though Plaintiffs maintained that strict scrutiny applies to AB 2098, Plaintiffs noted at oral argument that, if rational basis review applied in this case, their challenge would be significantly more difficult. Under such review, "[a] law is 'presumed to be valid and will be sustained' under rational basis review if it is 'rationally related to a legitimate state interest.'" *Tingley*, 47 F.4th at 1078 (citation omitted).

The court finds that California has legitimate, if not compelling, interests in assuring safe medical care for its citizens and regulating the practice of medicine within its borders. *See Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) ("[T]he States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect

---

*Enying Li v. Holder*, 738 F.3d 1160, 1164 (9th Cir. 2013) ("Well-reasoned dicta is the law of the [C]ircuit.") (citing *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir.2001) (en banc)).

**CIVIL MINUTES – GENERAL**

21

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

the public health, safety, and other valid interests they have broad power to establish standards
for licensing practitioners and regulating the practice of professions."); *Recht v. Morrisey*, 32
F.4th 398, 413 (4th Cir. 2022) (a state "unquestionably has a compelling interest in assuring
safe health care for the public") (citation and internal quotation marks omitted), *cert. denied*,
No. 22-175, 2022 WL 17573477 (U.S. Dec. 12, 2022); *cf. EMW Women's Surgical Ctr., P.S.C.
v. Beshear*, 920 F.3d 421, 437 (6th Cir. 2019) (noting "[a]s part of States' regulation of the
medical profession, they may require doctors to provide information to their patients to ensure
patients can give their informed consent").  The fact AB 2098 concerns COVID-19 specifically
does not preclude a finding that AB 2098 concerns legitimate state interests.  Courts around the
country have held that limiting the transmission of COVID-19 to mitigate the effects of the
pandemic on societal and economic interests is a compelling government interest.  *See Roman
Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of
COVID-19 is unquestionably a compelling interest."); *Ass'n of Jewish Camp Operators v.
Cuomo*, 470 F. Supp. 3d 197, 224 n.10 (N.D.N.Y. 2020) ("Multiple courts that have considered
the issue have concluded that controlling the spread of COVID-19 counts as a compelling
interest.") (internal quotation marks omitted) (collecting cases); *Case v. Ivey*, 542 F. Supp. 3d
1245, 1279 (M.D. Ala. 2021), *aff'd*, 2022 WL 2441578 (11th Cir. July 5, 2022) (stating
"preventing the spread of the COVID-19 virus" is a "compelling state interest") (citation
omitted); *cf. We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir.) (noting "the State
has an indisputably compelling interest in ensuring that the employees who care for hospital
patients, nursing home residents, and other medically vulnerable people in its healthcare
facilities are vaccinated against COVID-19, not just to protect them and those with whom they
come into contact from infection, but also to prevent an overburdening of the healthcare
system"), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021), *and cert. denied sub nom. Dr. A. v.
Hochul*, 213 L. Ed. 2d 1126 (June 30, 2022); *Norwegian Cruise Line Holdings Ltd v. State
Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1156-58 (11th Cir. 2022) (Rosenbaum, J.,
dissenting) (describing COVID-19's death toll, potential long-term medical complications, and
effects on commerce).  Though Plaintiff disputes the relevance of COVID-19 pandemic-related
interests at this point in time, (*see* Reply at 13), the materials before the court do not set forth a
principled reason to break from the authority set forth above on the basis that AB 2098

**CIVIL MINUTES – GENERAL**

22

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

specifically addresses treatment provided in connection with COVID-19.  Accordingly, the court finds that AB 2098 concerns legitimate state interests.

Rational basis review "asks whether 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  *Fowler Packing Co., Inc. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016) (quoting *F.C.C. v. Beach Comms., Inc.*, 508 U.S. 307, 313 (1993)).  Stated differently, the court "ask[s] only whether there are 'plausible reasons for [the Legislature's] action,' and if there are, '[its] inquiry is at an end.'"  *Romero-Ochoa v. Holder*, 712 F.3d 1328, 1331 (9th Cir. 2013) (quoting *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).  "This inquiry is not a 'license for courts to judge the wisdom, fairness, or logic of legislative choices.'"  *Fowler Packing*, 844 F.3d at 815 (quoting *Beach Comms.*, 508 U.S. at 313).

The California Legislature made numerous findings in enacting AB 2098.  The statute recites that "[t]he global spread of the SARS-CoV-2 coronavirus, or COVID-19, ha[d] claimed the lives of over 6,000,000 people worldwide, including nearly 90,000 Californians" at the time it was drafted.  AB 2098 § 1(a).  The Legislature also found that "[d]ata from the federal Centers for Disease Control and Prevention (CDC) shows that unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated," *id.* § 1(b), and "[t]he safety and efficacy of COVID-19 vaccines have been confirmed through evaluation by the federal Food and Drug Administration (FDA) and the vaccines continue to undergo intensive safety monitoring by the CDC," *id.* § 1(c).  The Legislature noted the particular concern that "[t]he spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence and placed lives at serious risk," *id.* § 1(d), and "[m]ajor news outlets have reported that some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals," *id.* § 1(e).  The Legislature's findings also reference the Federation of State Medical Boards' "warning that physicians who engage in the dissemination of COVID-19 vaccine misinformation or disinformation risk losing their medical license, and that physicians have a duty to provide their patients with accurate, science-based information."  *Id.* § 1(f).

**CIVIL MINUTES – GENERAL**

23

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

The court finds AB 2098 is rationally related to California's legitimate state interests. This is not a situation in which California arbitrarily selected a particular disease to regulate more strictly than others. California enacted AB 2098 in the context of these findings that "mis-" and "dis-" information underlying medical providers' care of their patients suffering from COVID-19 is both widespread and has the potential to aggravate the effects of a potentially deadly disease. The court does not find that the evidence in the record or applicable law provides sufficient cause for the court to doubt these findings. And, as discussed above, a physician or surgeon's liability under AB 2098 is further limited by reference to the prevailing scientific consensus, the familiar concept of the "standard of care," and the required showing of falsity. The consequence of a violation of AB 2098 is that the offending physician or surgeon would be deemed to have committed "unprofessional conduct," a sanction rooted in California law since, at least, 1876. In light of the findings of the California legislature indicating the spread of "mis-" and "dis-" information in COVID-19 treatments is a widespread issue that could cause significant harm to patients' health, as well as the limitations embedded in AB 2098, the court finds the statute is sufficiently tailored to California's legitimate state interests. *See Tingley*, 47 F.4th at 1084 (holding Washington's law was "appropriately tailored" to its asserted interest in protecting the well-being of youth where "Washington reasonably relied on scientific evidence and the consensus of every major medical organization to prohibit [conversion therapy] on all children" considering "[t]he difficulties in having therapists, legislators, and judges assess whether a minor is consenting, without coercion, to a therapeutic practice that every major medical organization has opposed"); *Pickup*, 740 F.3d at 1232 (holding legislature acted rationally in decision to protect well-being of minors where legislature relied on report of the Task Force of the American Psychological Association and "opinions of many other professional organizations" of which the "overwhelming consensus" was that demonstrated prohibited treatment was harmful and ineffective despite "some evidence" it was "safe and effective").

For the reasons set forth above, the court finds AB 2098 is rationally related to legitimate, if not compelling, government interests. Accordingly, the court finds Plaintiffs have not demonstrated serious questions going to a likelihood of success on their First Amendment challenge.

**CIVIL MINUTES – GENERAL**

24

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS          Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

iii.  *AB 2098 Falls Within the Longstanding Tradition of Regulations on the Practice of Medical Treatments*

The court observes that the Supreme Court has permitted "restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality" without the application of strict scrutiny.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83, (1992) (citations and internal quotation marks omitted); *see also United States v. Alvarez*, 567 U.S. 709, 717-18 (2012) (plurality op.) (stating that content-based speech restrictions have been permitted for a "few historic and traditional categories" of speech, including incitement, obscenity, defamation, speech integral to criminal conduct, "so-called 'fighting words,'" child pornography, fraud, true threats, and "speech presenting some grave and imminent threat the government has the power to prevent").  Along these lines, the Ninth Circuit in *Tingley* stated that "[t]he Supreme Court has recognized that laws regulating categories of speech belonging to a 'long . . . tradition' of restriction are subject to lesser scrutiny."  47 F.4th at 1079 (quoting *NIFLA*, 138 S. Ct. at 2372).  As stated by the Ninth Circuit:

> What follows from this line of cases [(referring to *NIFLA*, *Alvarez*, *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 792 (2011), and *United States v. Stevens*, 559 U.S. 460 (2010))] is that in some circumstances, a seemingly novel restriction on speech, even if content-based, may be tolerated, but only if there is a "long (if heretofore unrecognized) tradition" of that type of regulation, [*NIFLA* 138 S. Ct. at 2372], and the category is not too broad.  Whether we view Washington's law as falling into the exception from heightened scrutiny for regulations on professional conduct that incidentally involve speech . . . , or, alternatively, . . . , as falling into the tradition of regulations on the practice of medical treatments, the law satisfies the requisite scrutiny.

*Id.* at 1080.

**CIVIL MINUTES – GENERAL**

25

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

The Ninth Circuit in *Tingley* proceeded to recognize the "long (if heretofore unrecognized) tradition of regulation governing the practice of those who provide health care within state borders." *Id.* (citing *Dent v. W. Va.*, 129 U.S. 114 (1889); *Hawker v. People of N.Y.*, 170 U.S. 189, 191 (1898)). The Ninth Circuit further emphasized that "such regulation of the health professions has applied to all health care providers," *id.* and "the [Supreme] Court has upheld substantive regulations on medical treatments based upon differences of opinion and, in doing so, has relied upon the positions of [] professional organizations . . . , even when those positions have changed over time," *id.* at 1081. The Ninth Circuit cautioned against discounting the "long tradition of this type of regulation" in a way that "would endanger centuries-old medical malpractice laws that restrict treatment and the speech of health care providers," *id.*, emphasizing that "[w]hen a health care provider acts or speaks about treatment with the authority of a state license, that license is an 'imprimatur of a certain level of competence,'" *id.* at 1082 (quoting *Otto v. City of Boca Raton*, 41 F.4th 1271, 1294 (11th Cir. 2022) (Rosenbaum, joined by Prior, JJ., dissenting in the denial of rehearing en banc)).

While, as discussed above, the court finds AB 2098 independently satisfies the applicable scrutiny analysis, the court further observes binding case law would otherwise militate towards upholding the statute "as falling into the tradition of regulations on the practice of medical treatments" if not "falling into the exception from heightened scrutiny for regulations on professional conduct that incidentally involve speech." *Id.* at 1080; *see id.* at 1080-83; *see also Doe*, 54 F.4th at 520 ("The norm that units of government may require physicians (and other professionals) to provide accurate information to their clients long predates [*Planned Parenthood of S.E. Pa. v.*] *Casey*[, 505 U.S. 833, 882 (1992)] and has not been disturbed since."). California law follows this long tradition recognized in *Tingley*; going back to as early as 1876, California statutes have provided for the discipline of medical practitioners and the revocation of their licenses for "unprofessional conduct." *See* 1876 Cal. Stats., ch. 518, p. 792 § 10 (1876). These laws define "unprofessional conduct" by reference to standards such as "gross negligence," "repeated negligent acts," and "incompetence," Cla. Bus. & Prof. Code § 2234(b), (c), (d), and, in some circumstances, in terms of specific offenses, *see id.* §§ 2234(e) (acts related to the practice of medicine involving dishonesty or corruption), 2266

**CIVIL MINUTES – GENERAL**

26

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

(recordkeeping requirement), 2250 (willful failure to comply with requirements relating to informed consent for sterilization procedures) § 2236 (criminal convictions related to the practice of medicine). To violate AB 2098, a physician or surgeon's conduct must run afoul of both historical conscriptions: a physician or surgeon must violate an established medical standard (the standard of care) that is accomplished by means of specified conduct (conveying information related to the treatment or advice of COVID-19 that is false and contradicted by the contemporary scientific consensus). Accordingly, the court finds it fits comfortably within the long tradition of California's, and the states', regulation of medical practice, which further supports the court's finding it is constitutional.

D.    Remaining Preliminary Injunction Factors

Plaintiffs assert that the remaining *Winter* factors favor issuing a preliminary injunction, contending that a colorable First Amendment claim supports a finding of irreparable harm; that the public has a significant interest in the protection of First Amendment rights; and that AB 2098 burdens medical professionals' speech. (Mot. at 29; Reply at 16-17.) Defendants contend that Plaintiffs have not shown sufficiently concrete irreparable harm warranting a preliminary injunction; California has a strong interest in enforcing AB 2098 to protect patients and the public; and AB 2098's limited reach beyond California's existing medical malpractice laws demonstrates any harm to Plaintiffs would be minimal. (Opp. at 28-29.)

Because the court finds Plaintiffs have insufficiently demonstrated a likelihood of success on the merits of their claims, the court "need not consider the remaining three" *Winter* factors. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (quoting *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir.2011)); *see also Garcia*, 786 F.3d at 740. Nevertheless, the court balances them here. It is settled law that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009) (alteration omitted) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, (1976)). And a party "seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury" by sufficiently demonstrating the "existence of a colorable First Amendment claim."

**CIVIL MINUTES – GENERAL**

27

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS            Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 46 F.4th 1075, 1098 (9th Cir. 2022) (quoting *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 973 (9th Cir. 2002)). "But the mere assertion of First Amendment rights does not automatically require a finding of irreparable injury." *CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 851 (9th Cir. 2019). "It is the 'purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes.'" *Id.* (alteration in original) (quoting *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984)); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.") (citation omitted); *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (citation omitted). Because the court finds AB 2098 complies with the First Amendment, and the record insufficiently demonstrates instances in which Plaintiffs have, as a matter of fact, altered the advice they intend to give to medical patients as opposed to their concerns they will need to do so, the court finds Plaintiff have insufficiently demonstrated irreparable harm favoring entry of a preliminary injunction. *See CTIA*, 928 F.3d at 851.

When the party opposing injunctive relief is a government entity, "the third and fourth factors—the balance of equities and the public interest—'merge.'" *Fellowship of Christian Athletes*, 46 F.4th at 1098 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As a general matter, the court recognizes the "significant public interest in upholding free speech principles" where "the ongoing enforcement of [] potentially unconstitutional regulations would infringe not only the free expression interests of plaintiffs, but also the interests of other people subjected to the same restrictions." *Klein*, 584 F.3d at 1208 (cleaned up). But Plaintiffs have not demonstrated a likelihood of success on their claims, and, separately, First Amendment freedoms are not *per se* "'beyond regulation in the public interest,'" including "regulation[s] aimed at reducing the risk of 'expos[ing] the community . . . to communicable disease or the latter to ill health or death.'" *See Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1182 (9th Cir. 2021), *reconsideration en banc denied*, 22 F.4th 1099 (9th Cir. 2022) (second alteration in

---

**CIVIL MINUTES – GENERAL**

**28**

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

original) (quoting *Prince v. Mass.*, 321 U.S. 158, 166-67, (1944)). Here, the record demonstrates that the public has a strong interest in ensuring patients receive truthful medical information based on which they can make informed decisions about their healthcare related to treatments about COVID-19, a virus the California Legislature's findings demonstrate is both the cause of a significant number of deaths and subject to rampant "mis-" and "dis-" information regarding its effective treatment. In light of these considerations, the court finds AB 2098's implementation is likely to promote the health and safety of California COVID-19 patients and thus the balance of equities and public interest favor denying the Motion. *See Doe*, 19 F.4th at 1182 (finding public interest "weigh[ed] strongly in favor of denying" preliminary injunction against mandatory COVID-19 vaccination policy in school district where record demonstrated the virus "[c]laimed the lives of over three quarters of a million Americans" and "that vaccines are safe and effective at preventing the spread of COVID-19").

## IV.  Disposition

While *NIFLA* voided the professional speech doctrine as a categorial rule, it did not abrogate California's ability to regulate licensed professionals any time those measures relate to the provision of professional advice.[5] *Cf. Tingley*, 47 F.4th at 1071-78; *Del Castillo*, 26 F.4th at

---

[5] The court notes that, outside of the medical profession, other established legal frameworks that arguably can incidentally burden professionals' client-facing speech in the primary pursuit of regulating occupational conduct and ensuring clients are adequately protected. For example, a seller of securities may be held liable for a materially misleading statement of fact contained within an opinion statement if a proper plaintiff establishes the supporting fact supplied by the speaker is untrue, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017); *Omnicare, Inc. v. Laborers Dist. Council Const. Ind. Pension Fund*, 575 U.S. 175, 186 (2015), and it is impermissible for a lawyer to make materially false statements of law or fact under accepted rules of professional conduct, *see, e.g.*, Cal. Bus. & Prof. Code § 6068(d); ABA Model Rules 4.1(a), 8.4(c). To the extent the medical profession could be considered unique, the court observes that Ninth Circuit precedent

---

**CIVIL MINUTES – GENERAL**

29

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:22-cv-01805-FWS-ADS                    Date: December 28, 2022
Title: Mark McDonald *et al.* v. Kristina D. Lawson *et al.*

1219-25; *Doe*, 54 F.4th at 520-21.  As discussed in this Order, and in consideration of binding and persuasive post-*NIFLA* precedent, the court finds Plaintiffs are unlikely to succeed on their constitutional claims.

In the end, Plaintiffs seek a preliminary injunction barring the enforcement of AB 2098, "an extraordinary remedy that may be awarded only if the plaintiff clearly shows entitlement to such relief."  *Am. Beverage Ass'n*, 916 F.3d at 754.  For the reasons set forth above, the court finds Plaintiffs have not met that standard.  Accordingly, the Motion is **DENIED**.

**IT IS SO ORDERED.**

---

recognizes the "imperative need for confidence and trust inherent in the doctor-patient relationship."  *See Conant*, 309 F.3d at 636 (citation and internal quotation marks omitted).

---

**CIVIL MINUTES – GENERAL**

30